Statement of the Case.
MONROE, C. J.
Defendant brings up this appeal from a judgment awarding plaintiff $2,120.75 as damages, alleged to have been caused by the negligent handling of a motor truck and trailer by one of defendant’s employés, as a result of which the trailer collided with, and knocked down, or broke, one after the other, three cast-iron posts, which, being set in the banquette, near the curb, in front of a building owned by 'plaintiff, supported a gallery composed of iron scroll work with floors of plank, and extending from the front of the building, on the second and third stories, across the banquette, which gallery, by reason of the removal of its supports, fell to the banquette and was reduced to a mass of unavailable débris, and in so doing tore loose its attachments to, thereby damaging, the front of the house, breaking the window blinds, and subjecting defendant to other pecuniary loss. Testimony as to the occurrence and extent of the damage, given by a number of witnesses who corroborate each other, establishes the facts beyond doubt.
It is thus shown that a negro chauffeur, with another employé of defendant at his side, was driving a 40 horse power Packard truck, to which was attached a “trailer” in the form of a spring wagon, down Oamp street at about 9 o’clock on a morning in April; that the wagon had a pole extending out in front, which was attached to, or formed, a Y at the rear end, the arms or branches of which, respectively, were bolted, or should have been bolted, to the front axletree of the trailer; while the forward end of the pole was hooked to the truck. As this tandem of vehicles approached St. Joseph street, *607 upon which the Illinois Central Railroad Company has a track, the gatekeeper employed by that company observed that the right arm of the Y had become detached from the axletree of the trailer and was hanging loose, and, in consequence, that as the truck, which was moving at (what we consider) a pretty rapid pace, under the circumstances, moved off and on the street car track (on Camp street), the trailer zigzagged behind in rather an irresponsible fashion, scraped the curb on the right for perhaps 100 feet, and then came near colliding with the gate which the keeper was operating; and the same thing attracted the attention of an ice man, who attempted to warn the chauffeur by whistling at him, but was successful only to the extent that one of the two men on the truck glanced around, and, seeing nothing that interested him, the truck proceeded across St. Joseph street; and about that time the eccentric movements of the trailer attracted the attention of another witness who, walking up Camp street had arrived in front of plaintiff’s building, and, seeing the trailer again scraping the curb and heading for the gallery, realized that a collision was imminent and attempted to avert it by vocally warning the men on the truck. His testimony as to what he saw and did reads, in part, as follows:
“I saw the thing coming, grinding the curb all the way down Camp street. * * * About SO feet from the house when I hollered. * * * I moved off when I saw the trailer coming in on the banquette. * * * Q. When you first saw the truck, had you passed from under the gallery? A. No, sir; I walked out — about the center of the gallery — to the curb and hailed the darkey, and the two negroes were so deeply interested in conversation that they did not pay any attention. As soon as I saw that there was to be an accident, I got from under about 10 feet. * * * Q. You saw the whole thing? A. Yes, sir; I saw when the trailer struck the third post, I think; it broke loose, and the truck ran ahead about 70 or 80 feet or more. Q. Did the truck break loose from the trailer? A. Yes, sir; on the third post; either the chain pulled off or the pole broke, I don’t know which.”
From the testimony thus quoted, with much other, it appears that the trailer scraped the curb until it reached a point immediately above plaintiff’s house, where the curb was opened for the purpose of an entrance for vehicles into plaintiff’s premises, into which it swerved until, controlled by the onward pull of the truck, the wheels on the right side mounted the banquette and the trailer began its assault upon the gallery posts, which were set in the banquette a few inches inside of the curb and probably about 8 feet apart, and, breaking them off,, in one, two, three order, stopped at the third post with the first two inside of it (the trailer), where they had fallen, together with other debris of the gallery, and with the third post broken off at the bottom and leaning against the front of the trailer — the truck having, in the meanwhile, parted company with it, and run .on down the street for a distance, most of the witnesses say, of about 100 feet, by which time the chauffeur and his companion had probably finished their conversation.
The chauffeur’s explanation of the affair, given in his own words, is as follows:
“My idea was, it simply could not be helped. My idea was, a pin must have broke when I pulled off the track, and that accounted for the wagon going wild, and it hit the curb and jumped up on the sidewalk.”
He says that all that he could do was to stop when the collision occurred; that he did stop, with the truck still connected with the trailer, for about half an hour; that he then, by direction of the policeman, who had come upon the scene, went back and unhooked the trailer from the truck.
The policeman testifies that when he got there, about ten minutes after the accident, “the truck was away from the trailer about 90 feet.” And of the 15 or 20 witnesses who testified in the case, not one saw the truck and the trailer any closer together *609 from the moment of the collision with the first post; some, who witnessed, the collision, saw them part company at that moment; and some, who were on the spot immediately afterwards, saw them from 80 to 100 feet apart.
The chauffeur says that the truck was slow — the slowest that he ever handled; that 8 miles an hour was its best gait; that he was running slowly at the time of the accident, not more than 5 or 6 miles an hour. Asked what he found when he went back to the trailer, he replied:
“On the right side, I noticed where a pin was out and a key through the bolt. I noticed that the pin was out of that; the whole [hole] was vacant; the shaft [referring to the right arm of what we have called the Y] was hanging on that side, after it struck the building; I didn’t notice it before it struck.”
A witness called by defendant testifies that he was defendant’s saw filer and millwright; that he keeps up the truck and looks after the trailer; makes the bolts that go into the shaft and gives them to the chauffeur. Asked whether he had inspected the trailer or the truck on the day of accident, he was unable to recall such inspection, nor does he say when he had inspected them.
It is shown that plaintiff called for estimates of the cost of replacing the gallery; that the lowest estimate that he received was $2,066; that he paid $55 for having the débris removed from the banquette and $5.75 for some other work that was required for the safety of the public; a further claim for $300, for the loss of the use of the gallery, was rejected. He has not asked that the judgment be amended.
Opinion.
The defense seems to rest upon the proposition that plaintiff’s gallery was an illegal obstruction to the banquette, hence that plaintiff was a trespasser; that no one owes any duty to a trespasser, save to abstain from willfully and wantonly injuring him, and that he is entitled to no compensation for loss and damages inflicted upon him by the mere negligence of another; that the owner of a vehicle is not responsible for damages caused 'by an accident arising out of a latent defect in a mechanism which, shortly before the accident, had been inspected and found in good condition.
[1] 1. Whatever may be said as to the obligation of an owner of private property towards a trespasser thereon, we have been referred to no authority, and we know of none, which sustains the view that one citizen may, 'with impunity, whether willfully or negligently, destroy the property of another, which in no way inconveniences him, and which, upon a claim of right and with the sanction of a municipal government, occupies a portion of a street administered by such government.
[4, 5] A citizen has no right of action for the removal of an obstruction, alleged to be a nuisance, from a public street, unless he is able to show that it causes a particular injury to his person or property; and still less has he the right either to take the law into his own hands ■ and willfully destroy such property, or to destroy it by his negligence. The question of nuisance vel non in such case, is to be determined between the corporation, administering the street; and the citizen, claiming ownership of the property. 28 Cyc. 898, 899; 29 Cyc. 1216; Wood on Nuisances, § 64; Blanc et al. v. Murray, 36 La. Ann. 163, 164, 51 Am. Rep. 7.
It is a matter of public and judicial history that galleries, or “verandas,” as they are also called, have been sanctioned by usage in New Orleans almost from time immemorial. More than 60 years ago, where one citizen sought to abate, as a nuisance, a veranda, such as that here in question, *611 which had been constructed, by his neighbor, this court said:
“Every front proprietor is clearly under an obligation not to obstruct the free use of the street; and the enforcement of this obligation concerns the municipal authority, which has enforced it, as shown by the ordinance of 1852, by the prohibition to erect awnings or balconies, which shall be less elevated than eight feet above the sidewalk. As to verandas, of the kind erected by defendant, extending the whole breadth of the sidewalk and elevated far above it by columns on a line with the curbstone, which the evidence shows to have become so common of late years, they are very obviously, so far as the public is concerned, a great improvement as compared with the hanging galleries and wooden sheds which extend only to the half or the third of the width of the sidewalk, and from which the drip, in rainy weather, is so great an annoyance to foot passengers.
“These modem verandas, on the contrary, afford a perfect shelter from the sun and weather, to passers-by the front of houses to which they are attached. In sultry climates, the necessity of shade from the sun, to health and comfort, has universally introduced the custom of balconies or verandas, which, in this respect, are equally beneficial to the inmates of the houses and to wayfarers.” Durant v. Riddell, 12 La. Ann. 747.
In a much later case, the foregoing expression of opinion is referred to with approval and applied to the case of .trees whose limbs overhang a sidewalk; the court saying:'
“To those who live in this climate, particularly during the hot summer months, when the thermometer points to about 100, when not more, it would be needless to argue that the overhanging branches of magnolia trees on such sidewalks are no nuisance, but, on the contrary, actually prove of great relief, not only against the heat, but also, sometimes, even against the rain.”
And the defendant (company), the agents of which entered plaintiff’s premises and cut branches overhanging the sidewalk from the trees on the premises, was condemned in damages. Tissot v. Telephone & Telegraph Co., 39 La. Ann. 1001, 3 South. 261, 4 Am. St. Rep. 248.
In the still later case of City of New Orleans v. Kaufman, 138 La. 897, 70 South. 874, defendant was convicted of violating a city ordinance prohibiting the building of sheds over sidewalks, but excepting from its operation existing balconies of dwelling houses and marquises or awnings to protect show windows, provided no signs, advertisements, ' appeared thereon, from which it might be inferred that, while the city authorities were not disposed to legislate against existing balconies, they were not favorably inclined towards the building of new ones. We are not, however, informed that they have enacted any ordinance prohibiting the building of such balconies, and it is yet to be ascertained that such action can be made effective, if taken; the quoted decision being apparently unfavorable to that view. But supposing that such an ordinance had been passed, and might be enforced, the case against defendant loses nothing of its strength, since plaintiff, through the negligence of defendant’s agent (if it be so found), had an existing veranda which, by express legislation, he was to be allowed to keep, and, it having been thus destroyed, he is denied the right, or must litigate in order to enjoy the right, to replace it.
We therefore conclude that defendant’s first stated proposition is not well founded.
[2] 2. The second proposition, as applied to this case, is equally without merit. Apart from the question of “latent defect,” etc., therein presented, the evidence is conclusive that defendant’s chauffeur ran his 40 horse power machine for 250 or 300 feet, at a fairly high speed, on and off of the street railroad track, with the trailer hanging on by one arm of its Y and zigzagging from one side to the other of a much-traveled thoroughfare, like the tail of a kite in a high wind, and that he not only did not look behind, of his own accord, but was so engrossed in conversation with his companion *613 (whose proper position, as we apprehend, was on the trailer), that he took no other notice of two attempts that were made to inform him of the situation than casually to turn his head, without really looking (if, indeed, it was he whose head is said to have turned, and not the other man), or certainly without seeing that which he should have seen. He neither saw the trailer in its gyrations, nor did he hear it scraping the curb, both above and below St. Joseph street, and though apparently blind, deaf, and unobservant, he must have driven the machine at a fair speed or it would not have broken off and knocked down, one after another, three cast-iron posts, which, from the photographs in evidence, were hardly less than 8 inches in diameter, and know nothing about it until he had gone 80 or 100 feet further down the street.
[3] 3. Counsel further argue that the lower court erred in allowing recovery for a new gallery, when only an old one was destroyed. The obligation of defendant, however, is to indemnify plaintiff — to put him in the position that he would have occupied if the injury complained of had not been inflicted on him. It goes further than that of an insurer against loss by fire, who takes no risk against personal effort and inconvenience. And yet, so far as we know, those who are engaged in the insurance business do not undertake to build an old house, by way of indemnifying the assured for the loss of an old house, and no suggestion is here made as to the manner in which that can be done. According to the evidence of plaintiff’s contractor, the broken material of which the gallery in question was constructed, and- which, at the time of the trial, was lying in a confused heap on plaintiff’s premises, could not again be utilized in the construction of a gallery and it is not pretended that it could be so utilized, save by matching and welding the broken bits of iron, patching the flooring, and supplying missing parts of both with new material, all of which, when done, at an expense not estimated would result in the production of a gallery composed of matched, patched, and welded material, which would not be the gallery that was destroyed, or which plaintiff is bound to accept by way of indemnity for that which was destroyed. Defendant alleges in its answer that it had declined to have anything to do with the débris in question, sets up no claim for salvage, and has offered no evidence that the débris is of any value, or would compensate plaintiff for its occupancy of his premises. We therefore find no reason for making any change in the judgment appealed from on account of any possible salvage that he may realize.
The judgment appealed from is therefore
Affirmed.