(173 La. 760)

### SUGAR BROS. CO., Limited, v. CITY OF MONROE.

#### No. 27190.

Supreme Court of Louisiana.

Nov. 30, 1931.

Harry H. Russell, of Monroe, for appellant.

McHenry, Montgomery, Lamkin & Lamkin, of Monroe, for appellee.

LAND, J.

This is a suit for damages, in the year 1923, to a freight elevator, operated by plaintiff in its wholesale grocery store in the city of Monroe, La., and supplied by that city with electricity as a motive power from its municipally owned plant.

Plaintiff alleges that defendant negligently and carelessly changed the phases of electric current on the circuit on which plaintiff's store is located, thereby reversing the operation of the elevator, and causing it, when operated, to strike with such force the top beams or superstructure at the roof of the building occupied by plaintiff as to put the elevator out of commission and to damage it in the sum of $2,243.03.

· Defendant denies that any damage was occasioned to plaintiff's elevator by reason of any negligence or carelessness of respondent, its agents, or employees; avers that the damage caused to the elevator was due to the gross carelessness and negligence of plaintiff, its agents, and employees; and denies that the elevator was damaged in the amount alleged by plaintiff.

From a judgment against it for damages in the sum of $1,690.53, with legal interest from judicial demand, defendant has appealed.

We fail to find from the evidence in the case that plaintiff, its agents, and employees, were guilty of any negligence contributing to the accident to the elevator, which occurred on Monday morning, August 13, 1923, about 7:30 o'clock.

The elevator was in good condition prior to the accident, and had been operated up and down Saturday morning, August 11th, without mishap of any kind.

It is admitted that the changes made by defendant early Monday morning, August 13, 1923, in the phases of the electric current resulted in reversing the two-phase motor operating the elevator.

But plaintiff was not notified by defendant of any such contemplated changes in time to protect either its property or to secure the safety of its employees.

It was not until 9:30 or 10 o'clock Monday morning, August 13, 1923, that defendant gave plaintiff notice not to use the elevator. At that time the accident had occurred, and the elevator had been damaged.

The elevator had the following stops: The basement, first, second, and third floors; and, at the time of the accident, was operated by a colored employee, who' had had five years' experience.

In order to go down, you pull up on the cable; and in order to go up, you pull down on the cable.

On the morning of the accident, when the operator entered the elevator, he pulled down on the cable to go up, but the elevator went down into the basement within four feet of the bottom, and the operator reversed it to go down and it went up.

About the middle floor, the operator tried to stop the elevator in the usual way by putting it in neutral, but, regardless of the way it was reversed, it would not stop but kept going straight up, and he was forced to jump for his life when he got about a foot above the middle floor.

The negligence of defendant in changing the phases of electric current without timely notice to plaintiff had converted the elevator of plaintiff into a death trap, from which the employee of plaintiff was fortunate enough to extricate himself before the accident occurred.

The changing of the phases was done under the supervision of defendant's superintendent of electric lines, and without any notice whatever to plaintiff.

The superintendent of defendant admits that he was familiar with the fact that, unless the connection of the wires was made on the same phase that the motor was on originally, all motors already installed would run backward, or be reversed.

As a matter of fact, the superintendent made what he is pleased to call a test, after the connections were completed, by merely visiting some of the places of business, and finding several two-phase motors like plaintiff's running backward, and then went back to change two wires, as they had the phases crossed.

The superintendent of defendant's electric lines admits that there is a way to make these connections so that the motors will run in the right direction without going through this so-called test of personal inspection, after the connections are made, and after the damage has occurred.

When asked what is that way, he testified as follows: "In that case the way to have told the phase that that particular motor was running on would have been to go to the power house and take your high voltage line and trace it into the sub-station; which comes in 13,200 volts and transformed to 2,300 volts; got to test your line into that transformer and out, and that same source of supply from the power house to 9th and De Siard; follow the same wire into that station through a set of transformers and up town, and by that, all that tracing around, be sure when you connected the three wires here you could have them on the same three wires you originally had them on.

"Q. Had that course been pursued would the motors have run properly? A. If you had traced and got them on the same phase, yes sir.

"Q. There is nothing difficult about tracing those wires? A. No, nothing really difficult; just got to be there and follow the same wire out.

"Q. Just a matter of looking at the wire? A. Yes sir, and on the corners and make the turns down streets and alleys. Got to be sure to follow the same wire. If you start on number one be sure and continue on number one and not switch over.

"Q. I gather from your testimony that you knew at the time these wires were connected at Sixth and Louisville and behind the Masonic Temple in the alley that the way they were connected might possibly cause two phase motors to run backward? A. I knew if it didn't hit the same phase it would.

"Q. And a chance for that to happen? A. Yes, sir.

"Q. Did you go or send anyone to Sugar Brothers Limited to tell them that you were working on the wires and they should not use the elevator? A. No, sir.

"Q. Did you notify them in any way? A. No, sir.

"Q. That the wires were being changed and the motor might run backward? A. No, sir.

"Q. Did you yourself go to Sugar Brothers Limited on your trip to look at these motors? A. No, sir.

"Q. I also understand your testimony to be that because of the connections made either at Louisville and Sixth or back of the Masonic Temple that the phases were changed? A. Yes sir, I would say that caused the motors to run backwards; because we changed them again and the motors ran right."

The testimony of the superintendent of the electric lines of defendant clearly shows that there was a safe way in which to change the phases of the electric current, which was not adopted; but that he took a chance knowing, at the time, that if the connections were not properly made the result would be to cause the motors to run backward, and that this was done without any notice to plaintiff of any kind.

In our opinion, the superintendent of the electric lines of defendant was clearly guilty of inexcusable negligence and carelessness, which was the proximate cause of the damage to the elevator of plaintiff, and that defendant is liable for the damage thereby inflicted.

█ It is well settled that the duty is imposed upon the distributor or owner of the electric current to exercise extraordinary care and precaution to avoid mistakes, errors, and "accidents" in changing the phases of the electric current, the result of which may be serious injury to machinery, including elevators which may be driven by such motors. Lambert v. American Box Company, 144 La. 604, 81 So. 95, 3 A. L. R. 612; 58 A. L. R. 272, note; 7 A. L. R. 282, note, and cases there cited.

█ The admission in the defendant's answer that "the phases of the electric current furnished plaintiff were by accident changed" is not borne out by the evidence, in so far as an accident, in the usual significance of that term, is concerned. The change in phases was clearly due to the fault of defendant, its agents, and employees.

█ It remains only for us to fix the quantum of damages, which plaintiff has placed at $2,243.03 in the original petition, and, in its answer to the appeal praying for an amendment, increasing the judgment in plaintiff's favor from the sum of $1,690.53 to the amount originally sued for by plaintiff.

An employee of the Otis Elevator Company, whose duty it was to inspect and repair elevators, examined the elevator after the accident and testified to its condition as follows: "I found the car case was cracked over the

case-head, where it goes over the brake pulley; the car was broke, two or three big chunks out of the car; the worm was broke right in the center; the drum shaft was bent, both on the outside where the operating device goes on and also where the cable is fastened; the motor shaft was broke and a piece running through the motor; the car was halfway in the pit and the pulleys and everything were jerked out."

The expert of the Otis Elevator Company further testified as follows:

"Q. Was it necessary for the parts to be sent to the factory? A. Couldn't been repaired. They don't allow you to put a repaired or welded gear in a gear case, it is dangerous as it deteriorates the strength of the gear; and the machinery was old and for to get that gear case the cost of them you could get a new one made. The only thing to be done was what we did. It would practically cost the same to repair the old one and it would take a long time. Been twelve or fifteen years since they had that type of machine out.

"Q. Did you recommend to Mr. Sugar that it was cheaper to install new parts than to try to repair the damaged parts? A. Yes sir, I did.

"Q. Is it a fact it was cheaper to install the parts that were installed than to repair the old parts? A. Yes sir, by far."

In Lambert v. American Box Co., 144 La. 604, 81 So. 95, 3 A. L. R. 612, defendant's motortruck and trailer broke and knocked down three cast-iron posts, which supported a gallery extending across the banquette from the house, and the gallery, deprived of its support, fell to the ground and was destroyed. In that case, on pages 613 and 614 of 144 La., 81 So. 95, 98, the court said: "Counsel further argue that the lower court erred in allowing recovery for a new gallery, when only an old one was destroyed. The obligation of defendant, however, is to indemnify plaintiff—to put him in the position that he would have occupied if the injury complained of had not been inflicted on him. It goes further than that of an insurer against loss by fire, who takes no risk against personal effort and inconvenience. And yet, so far as we know, those who are engaged in the insurance business do not undertake to build an old house, by way of indemnifying the assured for the loss of an old house, and no suggestion is here made as to the manner in which that can be done. According to the evidence of plaintiff's contractor, the broken material of which the gallery in question was constructed, and which, at the time of the trial, was lying in a confused heap on plaintiff's premises, could not again be utilized in the construction of a gallery and it is not pretended that it could be so utilized, save by matching and welding the broken bits of iron, patching the flooring, and supplying missing parts of both with new material, all of which, when done, at an expense not estimated would result in the production of a gallery composed of matched, patched, and welded material, which would not be the gallery that was destroyed, or which plaintiff is bound to accept by way of indemnity for that which was destroyed."

As the elevator in this case was rendered worthless by the accident, plaintiff, the owner, was entitled to recover the cost of a new article, had he so desired; but instead, he replaced some of the parts with new ones, as this was cheaper than welding the old parts together. Lehigh Bridge Company v. Lehigh Coal and Navigation Co., 4 Rawle (Pa.) 9, 26 Am. Dec. page 111; 8 R. C. L. Damages, p. 487, par. 47.

Plaintiff paid out $2,243.03 for the following items:

Otis Elevator Company for replacing broken and damaged parts.... $1,325.00
Otis Elevator Company, for labor.. 44.76
Otis Elevator Company, for overtime of mechanic.................... 64.26
Allen Electric Company, for materials ......................... 173.60
Freight on elevator parts.......... 55.63
Drayage ......................... 10.00
Demurrage ...................... 1.00
Telegrams and telephone expenses.. 4.50
Extra labor for men employed to do work of the elevator while it was out of commission............... 564.28
                                    ─────────
Total ................ $2,243.03

The district court rendered judgment in favor of plaintiff in the sum of $1,690.53, or for $552.50 less than the full amount of damages claimed, $2,243.03. Evidently the trial judge intended to exclude the items of demurrage, $1, and of extra labor, $564.28, as too remote. In our opinion, these items are too remote and amount to a total of $565.28, and, when deducted from the amount of damages claimed, $2,243.03, leave a balance of $1,677.75 instead of $1,690.53, amount of damages awarded plaintiff. As an error in calculation has been made, manifestly by the lower court, it is our duty to correct same by amending the judgment appealed from.

It is therefore ordered that the judgment appealed from be amended by reducing the amount awarded plaintiff as damages from $1,690.53 to $1,677.75, and that the judgment, as amended, be affirmed.

It is further ordered that defendant pay the costs of appeal and the costs of the lower court.