**TUPPER et al. v. CONTINENTAL OIL CO.**
**Civil Action No. 1004.**

District Court, W. D. Louisiana,
Lake Charles Division.

Sept. 12, 1947.

O'Neill & O'Neill, of New Orleans, La., for plaintiffs.

Thos. F. Porter and Thomas L. Raggio, both of Lake Charles, La., for defendant.

PORTERIE, District Judge.

This is an action by members of the Tupper family to recover $3500 as damages to a mausoleum, which plaintiffs allege were caused by a shooting crew of the Continental Oil Company, in April, 1943.

The structure is about 12 feet by 14 feet, with a height of about 20 feet. Its original cost of construction in January, 1938, was $17,000.00. The walls of the mausoleum are of granite slabs, some of which are 11 feet, 4 inches long, 11 inches wide, and which weigh an average of 5800 pounds.

The shooting crew of the Continental Oil Company fired two test shots, each 562 feet from the mausoleum, one of two and one-half pounds of explosive on Sunday, April 18, 1943, and one of five pounds of explosive on Wednesday, April 21, 1943, and plaintiffs, in charging Continental Oil Company with causing the damage, rely upon these facts, together with the testimony of Charles H. Tupper and the testimony of Mrs. Grace Jester, to the effect that on the Sunday after the shooting, April 25, 1943, the doors of the mausoleum would not open, whereas on the Sunday before the shooting, the structure was in good condition.

Defendant contends that the mausoleum had some damage done to it, by some other party, prior to defendant's shooting; that whatever damage done by defendant was minor, superficial and in no way affected the usefulness or durability of the structure; that the cost of placing the structure in as good condition as it was, before defendant's shooting and assuming that all the damage to the mausoleum was caused by defendant, would be not in excess of $750.

We are unable to give favorable consideration to the contention of defendant that some other person than the defendant damaged the mausoleum.

The remark of the witness that such might have existed and had occurred even before the defendant began its operations was casual. No one gave it value at the time, or at any time later during the case. It is quite probable that further questioning would have proved away the remark of the witness. Anyway, the inference was not developed and is not sufficient upon which to predicate the dismissal of the case of plaintiff. It would be a gross injustice to do so.

We determine that after a consideration of the time element, the evidence in the record, direct and circumstantial, that it is inescapable that whatever damage the mausoleum is shown to have suffered was caused by the previously described explosions by the crew of the defendant company.

Now, we must approach the question of the amount of damages. We shall grant that the witnesses are equally trustworthy and competent. For the plaintiff, the original builder of the structure testified, and gave as his estimate, that the repair, inside and out, would cost $3500. Another witness for the plaintiff, a marble setter by profession, testified much in detail and along about the same lines as the original builder.

Four witnesses for the defendant, with only one of them, however, having made an actual examination of the structure testified that all repairs could be made for $750.

This substantial disparity in cost is caused by just what one set of witnesses would call a repair of the structure and what the other set of witnesses would call a repair of the structure. The expert witnesses for plaintiff would remove a whole slab of marble, which might merely have a corner chipped off, that is, "spalled"; the other experts would not remove the whole piece—only cut six inches or a foot off the end where the damage is and replace that part. There are fifteen chippings to the outside four walls.

Again, the great difference of cost is brought about that in repairing the cracked mortar between the slabs, the experts for the plaintiff would remove the slabs and

make a totally new setting on fresh mortar, with new lead shims, etc., whereas, the experts for the defendant claim that practically all of the mortar has remained in position, it being merely cracked, and that fresh, soft mortar could be forced in the crevices. Thus, no slabs would be removed; the joints would look solid and as before the injury; and the structure would be as good as before.

■ The question, therefore, is one of law. First, as to whether or not plaintiff may exact the type of repair that will cost $3500, or that defendant may be cast only for the type of repair that would cost $750.

Before ascertaining just what the law is on the point, we have come to the conclusion that the mausoleum, as it stands, damaged and without any repair at all, would be as useful as it has ever been before. The strong preponderence of the evidence from all experts is that this structure would be there as it stands for thousands of years. The safety is in the sheer weight.

The court asked one of the witnesses, a highly reputable and qualified engineer and architect, testifying for the defendant, we admit, but the one who had made a personal and close examination of the structure, the following: "May I ask you this as an expert engineer, without any repairs at all, is this structure as durable or less durable then before it was damaged?" He replied: "In my opinion the damage there is superficial, and the structure would be there forever, just like it is."

The evidence preponderates on the point that grout (soft or liquid cement) may be pushed and forced , from the outside, through the old cement where cracked and that this would be a good job, both as to appearance, support and solidity.

It is true that there is an air space (cavity) in the wall of the mausoleum and that the inside surface of the heavy marble wall is not visible. The cement forcing would be from only one side of the wall. It would be a great and prohibitive cost to take down and put back all the thin slabs of polished finishing marble on the inside. But, if taken down, one could see the heavy marble wall inside and force grout in the cracks (if any) from the inside, too, but the evidence is clear and preponderant that this is not necessary. The cement cracks are fine. The old cement has remained in place and the new cement will cork itself when pushed from the one side. There is no need of working from both sides.

However, over the whole structure the first remedial work would be to cut out the mortar for a depth ranging from one to one and a half inches and repoint it—put fresh mortar back and shape it. This type of repair is included in the aggregate of $750. However, to make it the safer, this should be done to a depth of two-thirds of the outer 11-inch marble wall, that is, seven inches deep. Some addition to the sum of $750 should be allowed for this contingency.

Then the defendant's experts say that upon the spending of $750, the chippings of the granite, called "spalls," not being deep or thick, could be chipped off and well replaced. The monument has rough stone on the exterior, as a whole, and the repair work in this roughness would not be noticeable. This chipping could be repaired so that it would not be visible and only an expert could locate it. It would seem to us that with the repair of the mortar joints that are cracked and with the repair of the chipped granite blocks, and, then, substituting a new piece at the northwest corner of the mausoleum, the structure would last indefinitely and would look closely as it did before the injury. But, it would still be true that the plaintiffs, knowing where to look, could see and locate the marble injuries, not only on the outside but, also, on the inside.

The court asked one witness: "So, then, after you have had built the repairs you mentioned to the court, what, if anything, would come to the notice of one who is not an expert?" And the answer was: "Nothing."

On the question of the cracked granite slab to be repaired with granite dust, presumably mixed with cement, the statement of the expert was: "The marble mechanic can patch that up with a material that you would never be able to see." And in answer to the question: "That would be a lasting job?", the answer was: "As long as the marble (granite) lasts."

Having determined that the acts of the defendant brought about the injury and since the witnesses of the defendant admit that the minimum cost of the repair of the injury is $750.00, that amount, of course, has to be granted.

To summarize, we quote a part of the testimony of the builder of the structure, plaintiffs' main witness, when recalled on rebuttal (Tr. p 200):

"The Court: May I ask one question? You described the first time you were on the witness stand what work would have to be done in your expert opinion and that it would be worth $3,500. Suppose that work were to be done like the young engineer Quinn mentioned, which would not mean the removal of any of these total slabs, and the pointing of the mortar all around the monument and between the slabs from the outside only and not from the inside, which would then leave, of course, the marble inside not having to be touched. That is what Quinn says.

"The Witness: That's right.

"The Court: And then these two bronze grill doors would have to be repaired and sent to the foundry. What would you think the cost of that should be? And I want you to be generous in that.

"The Witness: Well—

"The Court (Interrupting): Offhand, about?

"The Witness: I don't think it would exceed this figure. It could be done for less.

"The Court: You mean $750?

"The Witness: It could be done for less than that; yes sir."

The original builder of this monument stated that a large part of the inside marble will have to be replaced, because of chipping, cracking and dislocation—placing the quantity of marble that will have to be removed and replaced at 50% "in order to put it in perfect repair." This witness admitted that "marble can be patched but it will not be the same after it is patched and it is not restored to its original condition." This is an excessively expensive method of repair and the defendant should not be so cast.

When only a few minor injuries exist, for instance as to the crypts on the front,

inside, if a full and complete repair in the new is to be made, the cost will prove high and, indeed, excessive. To illustrate:

"Q. Do you know how many such crypts in the front had to be replaced? A. There are ten in all; whether there are three or six damaged, I don't know. But in our estimate we had planned on the possibility of having to replace all of them because in order to remove the ones that may not be damaged severely now, it is very possible it would either be broken in trying to take them out, plus the fact that the marble of the interior was a matched marble and you could not replace the ones that are broken and leave the ones that are not broken of two different materials. It would be like wearing a coat and pants of two different kinds."

On the other hand, the main witness for the defendant, a person of absolute reliability and competency, relative to the interior damage, testified as follows:    ·

"Q. Aside from the marble slabs above and below the back window, was there any damage done to the marble on the inside that you could find? A. No sir. I was told, though, on the occasion of my visit there, that there had been some remedial work done inside of the tomb.

"Q. That was to the front door, was it not? A. And also to the jambs of the doors.

"Q. But you could not find any damage to the marble on the inside, could you? A. None that you could observe."

So, all in all, we feel that to accomplish substantial justice in this case, this court on the facts, just like a jury would, should determine the amount somewhere between $750 and $3500.

The amount of $750 would, to any and all practical purposes, make this monument as serviceable and as durable as ever, and but for these imperfections the structure exteriorly would be as attractive and as beautiful as ever. The interior, however, will not be the same in appearance.

We arrive at the sum of $1000 to compensate the plaintiffs for these imperfections, particularly the flaws on the inside, and for the general fact that the structure will show

that it is a repaired one—making the total award by us of $1750.

We have read the cases submitted by both sides. We believe in making the award above the law of Louisiana has been followed. The sum of $750 would place the monument, from the utility viewpoint, to what it was before the injury, but from the artistic viewpoint it will not be the same monument. There will be exteriorly the jarring effect of some small piece of bright new stone next to the weathered stone. There will still be the fact that the repaired spallings may not last as long as the original stone, or, as the record shows, may show discoloration or stain in a few years, as compared to the unrepaired virgin stone. The mausoleum was built in 1937–1938. The amount awarded here is a reparation of the injury in all of its phases. We can not, in justice, conceive that this whole structure should be taken down and built anew. This would be an injustice to the defendant. The defendant company was never malicious in this matter; the injury was not intentional; it was proceeding in good faith and with great caution in that permission to shoot was sought from all landowners in the area. No damage was occasioned to any other in the neighborhood. Work of this character has been done in other localities, by the defendant, since the year 1925, and this is the first complaint. The operators for the defendant stated that the two explosive charges were not heavy, only five pounds and two and one-half pounds, and these were lighter than usual because of their noticing the nearness of the mausoleum. See: Sherwood v. American Railway Express Co., 158 La. 43, 103 So. 436; Midlo v. Fairchild Motor Corporation, La.App., 1935, 158 So. 245; Newman et al. v. Louisiana & Arkansas Railway Co. et al., La.App.2d Circuit, 19 So.2d 668; Dixon v. Futch, La.App., 166 So. 205; Lambert v. American Box Co., 144 La. 604, 81 So. 95; Vol. 25 Corpus Juris Secundum, Damages, § 83, p. 597.

This structure is decidedly top-heavy. The two granite slabs forming the roof each weigh ten tons—and are 18 to 20 feet up from the ground. Geophysical explorations cause a slight shaking of the ground laterally. You may well imagine the power, at rest, of this twenty-ton roof, acting at the end of a lever of nearly twenty feet. This caused the "chipping" or shearing of the stone at the corners of some of the lower slabs. Is this poor construction contributory negligence by the plaintiff? We can not rule affirmatively in the instant case because the erection of the structure antedates the general use of such shooting for the discovery and location of oil. But what would be the rule if such a mausoleum were built now, when economically and scientifically such shooting is generally accepted and is necessary for the common good?

Though the formal plea of contributory negligence has not been filed, the above paragraph is placed in this opinion to put builders of future mausoleums on notice that they are not free to build without restraint and without consideration of the rights of others.

Judgment will be signed, upon presentation, in favor of the plaintiffs in the sum of $1750, and costs.