180 So.2d 758 (1965)
William C. HAYWARD et al.
v.
Earl L. CARRAWAY et al.
No. 6475.
Court of Appeal of Louisiana, First Circuit.
November 16, 1965.
Rehearing Denied December 21, 1965.
*759 Samuel J. D'Amico, of D'Amico & Curet, Baton Rouge, Clay Parent, Baton Rouge, in pro. per., for appellants.
John I. Moore, of Taylor, Porter, Brooks, Fuller & Phillips, Baton Rouge, for appellees.
Before ELLIS, LOTTINGER, LANDRY, REID and BAILES, JJ.
LANDRY, Judge.
This action by William C. Hayward and his wife, Helene Reuss Hayward, seeks remuneration for property damage and compensation for consequent mental pain and anguish resulting from vandalism perpetrated upon the ante bellum plantation house *760 "Belle Helene", (formerly known as "Ashland"), the separate and paraphernal property of Mrs. Hayward situated in Ascension Parish.
The named defendants are: (1) Earl Carraway (Caraway), father of the minors Susie and Kay Caraway; (2) Sam Anselmo, Jr., father of the minors Lyman and Eldon Anselmo; (3) Clay Parent, father of the minor Carl Parent; (4) Great American Insurance Company, Caraway's liability insurer; and (5) Gulf Insurance Company, insurer of Anselmo.
After trial on the merits, judgment was rendered below in favor of Mrs. Hayward against Caraway, Anselmo and their respective insurers in solido, in the sum of $8,584.55, together with interest from judicial demand and all costs. Judgment was also rendered in favor of defendants rejecting the claim of plaintiff William C. Hayward which is for damages for mental pain and suffering only. Defendants' applications for new trial were overruled at which same time the lower court amended its original judgment to include Clay Parent as also liable in solido to Mrs. Hayward. From the aforesaid judgment all defendants have appealed suspensively excepting Clay Parent who took a devolutive appeal. Plaintiffs have appealed devolutivelyMrs. Hayward asking for an increase in the damages awarded her and Mr. Hayward requesting damages for mental suffering endured as a result of the destruction wrought by defendants' minor children.
Inasmuch as both plaintiffs and defendants have appealed, it is to be understood that hereinafter when the terms "appellants" and "appellees" are used, they shall denote defendants and plaintiffs, respectively.
In essence plaintiffs' petition alleges that Belle Helene was entered in or about the month of September, 1959, by the aforementioned minors without the permission or consent of its owner, Mrs. Hayward. Appellees further averred the structure was damaged in certain particularized amounts aggregating the sum of $12,807.55, recovery of which is sought by Mrs. Hayward. In addition, each plaintiff prays for judgment in the sum of $5,000.00 for historical, sentimental and esthetic loss, inconvenience, disappointment, annoyance, vexation, mortification and mental anguish.
The reasons for judgment handed down by the trial court indicate the award of $8,584.55 in favor of Mrs. Hayward was composed of the following items: $3,205.00 for the repair of two and one-half marble mantels; $379.55 as the cost of restoring balusters, floor boards, walls, shutters and roofing slate; and $5,000 for mental anguish.
Appellants' primary specifications of error maintain (1) the trial court improperly allowed the sum of $3,205.00 as the cost of repairing mantels despite the testimony of appellees' expert witness, Albert DeFrances, who estimated such repairs at a lesser amount; (2) the award of $5,000 to Mrs. Hayward for mental pain was excessive and should be reduced; and (3) the award of $379.55 for miscellaneous damage exceeds the amount established by appellees and should be decreased. Appellants' remaining specifications of error relate to one or more of those enumerated above and will hereinafter be discussed when disposition is made of the alleged errors hereinabove set forth.
The evidence discloses that Belle Helene, so named by John B. Reuss, was originally denominated Ashland by its first owner and builder, Duncan Farrar Kenner, a distinguished figure in Louisiana history. The mansion was completed in 1841 as an unusual example of Greek revival architecture, surrounded on all four sides by 28 massive square columns supporting a remarkably large entablature. There appears some question whether or not it was designed by the renowned architect, James Gallier. The preponderance of evidence in the record supports the conclusion its designer *761 is unknown. Without further detailing the architectural aspects of the edifice, it suffices to note the mansion possesses features of design and construction, both exterior and interior, warranting its preservation as the perfect example of a southern ante bellum plantation home. Unfortunately, this classic residence remained unoccupied for a period of approximately 25 years during which interval it fell into a state of considerable deterioration and disrepair due to the ravages of time, aided intermittently by vandals. Mrs. Hayward acquired the house in 1942, and approximately four years thereafter commenced the costly and time consuming task of restoration to which project she has devoted virtually her entire time and a considerable portion of her personal fortune as well as certain funds belonging to the community existing between her and her husband. The record leaves not the slightest doubt appellees have dedicated their remaining years and personal wealth to restoring the house to preserve it for the enjoyment and edification of future generations. At the time of trial appellees had expended some $70,000 in the rehabilitative procedure notwithstanding which a considerable amount of restoration remained to be done.
It is conceded that in the fall of 1959, appellants' minor children (ranging from 13 to 18 years) drove from their homes in Baton Rouge to Belle Helene Plantation and entered the house. Although all of the children were not present on each of the three occasions, the record leaves no doubt that they were acting in concert as found by the learned trial court. It appears that on the first visit they entered the house through an open door. They were challenged and frightened away by two men whom they thought to be trespassers like themselves, and whom they believed to be under the influence of narcotics from their appearance. The following day the children returned to the house in search of narcotics they assumed were left there by the two strangers encountered the previous day. Finding the door locked on this occasion, they made their ingress by means of a side entrance by prying loose a board which had been nailed to close the shutters on an opening the precise nature of which is not made clear by the record. The third and last entry was made October 24, 1959, on which occasion they were confronted by an employee working in the yard. The employee challenged their right to be on the premises and made a note of their automobile license as they drove away, from which source the identity of the children was ultimately ascertained.
The following day the Caraway and Anselmo children together with the Parent youth, (and other children who admittedly visited the house but were exonerated from blame and whom it is therefore unnecessary to name), were questioned at the Sheriff's office in Gonzales, Louisiana, by Deputies Lester Gonzales and Septine Trabeau. It is undisputed that on this occasion at least one parent of the Caraway and Anselmo children and the Parent lad were present. The children were taken by the aforesaid deputies into a room, one at a time, and questioned. Interrogation in this manner elicited confessions evidenced by two signed statements both of which were typewritten by Susie Caraway. The first statement, signed by Miss Caraway alone, states the following:
"Sheriffs Office, Gonzales, Louisiana, October 25th 1959, 1:40 P.M.
I Susie Caraway make the following statement to Lester Gonzales a deputy sheiff (sic) of Gonzales. This statement is being made of my own free will.
Raining first day we went and we got very wet. In fact drowned. I have visted (sic) the haunted home near Geismar, Louisiana at least three times. The first time I was with Eldon, Kay and myself. We were scared off by two men who I think were under the influence of dope. That was about two months ago. The second time I was *762 with Eldon, Kay, Lymand and myself. I forgot, Also (sic) Earl was with us. That was the next day of the first time we went. That was the day we did damage to the place. To start off we just sort of toured the house to see what we could see. After that we had the silly notion that there should be some dope in the house. So we started off by tearing up some lumber, and then we went to the third story of the building and looked around. We didn't find any dope or anything for that matter. Earl and Lymand broke up some windows that day and did a pretty good bit of damage to the rest of the house. I helped tear down one of the fire places. I wanted a piece of the marble. They threw some working equipment out of the window. I think they just about broke every window on the two floors. We broke in the pad locked (sic) room in the back of the house to see what was in it. We saw a lot of bats and we tried to scare them away. Then we saw a rat and stuck a big iron pipe or something like that in the rat. The pipe was what we used to get the pad lock (sic) off of the door. We didn't do any damage in there. The third time we went to the house was on October 24th of October (sic). We drove up to the house without turnign (sic) around the car. That Eldon, Kay, Earl, Lymand, Joe, Basil, Merrelyn and I. We went yesterday to show my cousin Merrelyn the house. We didn't see the posted sign on the gate until we came out of the house. We did see the sign just like it on the door when we were looking for an entrace (sic) to the house. They had it all locked up that time. So we looked around and finally found some boards on a door that looked like they could be easily taken off. Eldon and Lymand pulled the boards off and we went in. We stayed long enough to go down the hall and into some of the rooms. We didn't do any damage to the house yesterday except for the two boards that were pulled off. When we were already out of the house, a couple of the boys yelled at us to come to the road that a man was there to see us about trespassing. We went out there and saw this colored man and some kids with him. We talked to him and he asked us if we saw the sign. We told him not the one on the fence that we had just seen but we did see the one on the door. He told us that the lady that hired him is awfully mad about someone coming in the (sic) tearing up the house. But he gave us the impressinn (sic) that he would't (sic) tell her about catching us there. He kept saying she was mad. After we finished talking to him we went down the road a couple of yards and turned the car around and came home.
This statement is true to the best of my knowledge. I typed this statement myself."
The second statement is signed by Kay Caraway, Lyman and Eldon Anselmo and Earl Parent. It is also signed by three other minors exculpated from complicity in the depredation excepting the admission the others had informed them of the damage perpetrated to the house on their previous visits. In essence this statement acknowledges that Miss Caraway, the Anselmo children and the Parent youth were with Susie Caraway when damage was done to the "Geismar haunted house" and proceeds to list the damage done "such as breaking windows, pulling up boards and destroying stair cases."
Notwithstanding the near presence of their parents at the time of their interrogation and signing the confessions indicated, the children, nevertheless, at the time of trial, testified they signed the statements because they were afraid. Some maintained they affixed their signatures without being fully aware of the contents of the documents. Miss Susie Caraway, 17 years of age, and married at the time of the trial, *763 testified Deputy Gonzales may have even put words in her mouth. In essence, none of the minors involved could recall very much except they were adamant in the statements they had done little, if any damage, had not broken any mantels, and had even moved one piece of marble aside so that it would not be broken. They further maintained rocks were thrown only at windows already broken and that balusters pulled loose were already broken or rotted. In short, the testimony of the children was to the effect they admitted walking on the roof and breaking some slates but did practically no damage to the remainder of the house as it was in such a state of dilapidation it could not be damaged further. Miss Susie Caraway, however, acknowledged taking a small piece of marble as a souvenir.
Despite the protestations they signed the statements because they were afraid, each and every child acknowledged the statements and their signatures were freely and voluntarily made and affixed. Without exception they conceded they were not threatened nor were any promises or inducements offered. They all felt they were kindly treated. One of the parents who was with the children in Gonzales and waited while the children were questioned individually, complained that the investigation consumed the better part of a day. The record, however, does not support the conclusion the children were subjected to an extended, grueling examination over an excessive period of time. On the contrary, the record leaves the clear impression the interrogating officers treated the children with kindness. In this connection, it is significant that at the time of the trial Kay Caraway, who was 13 years old when her statement was given, testified the interrogating officers "were real sweet." We are in agreement with our learned brother below that the subsequent attempt of the children to exculpate themselves and minimize the extent of the damage wrought is unconvincing.
In their answer defendants contended the house constituted an attractive nuisance. Considering the minors involved were teenagers whose ages ranged between 15 and 18, excepting one who was 13, it is understandable that the point is not urged on appeal. Nevertheless appellants contend the house was in such a state of dilapidation the children were justified in thinking it an abandoned ghost house incapable of being damaged. That the juveniles may have considered the building a "ghost house" or "haunted house" is of no consequence inasmuch as the intention of a party committing vandalism does not affect the right of recovery of the injured party. Our Civil Code LSA-C.C. Article 2318 makes the parent or tutor liable for the torts of his minor child or ward. That the child may have no intent to do harm does not exonerate the parent or guardian from liability for his torts. We are aware of the tendency on the part of present day society, adults and juveniles alike, to regard immovable property which is unoccupied or not in use by its owner, as common property or property belonging to no one in particular or public property belonging to all. However, we hasten to add, for the benefit of the uninformed who may believe otherwise, that such concept finds no support in our law. Furthermore, we are not aware and have been cited no authority in our law which recognizes or establishes the concept of abandoned immovable property.
Before proceeding to a disposition of the three principal specifications of error advanced by appellants as hereinabove set forth, we deem it advisable to consider at this point a certain incidental argument advanced by learned counsel for defendants. It is contended the trial court erred in relying upon the testimony of the Deputy Sheriff concerning his examination of the premises after the vandalism. The position taken is predicated on the fact that the witness conceded he had not seen the condition of the house prior to its entry by the minors involved. We find no merit in this argument inasmuch as the record *764 reveals clearly that our esteemed colleague below did not rely solely on the testimony of the Deputy Sheriff. Said officer's testimony is merely corroborative of other evidence of record in that in essence he testified the damage he viewed was obviously recent.
Appellants maintain the trial court erred in finding the children broke two and one-half marble mantels. Appellees concede that five and one-half of the eight mantels in the house were destroyed in 1958 by vandals whose identities are unknown. Defendants initially contended all of the mantels were destroyed as a result of the depredation wrought in 1958, but photographs taken in March 1959, by William Deadman, a visiting architectural student, and introduced in evidence, together with Mr. Deadman's testimony, establish that all of the mantels had not been destroyed previously. On this issue the testimony of appellees, who visited the house frequently, is also to the effect that not all the mantels were previously destroyed and two and one-half mantels remained intact following the extensive vandalism sustained in 1958.
Defendants rely rather heavily on the testimony of the children denying most of the damage. However, upon questioning by the authorities they admitted the destruction of one mantel as evidenced by the statement hereinabove set forth. The trial court obviously believed the statement which was corroborated by the testimony of the investigating officers who in effect deposed the content thereof accurately represented the account of the occurrence related by Miss Susie Caraway. Under the circumstances, we conclude our learned brother below correctly resolved the matter by concluding the parties involved damaged the remaining two and one-half mantels.
It is settled law that self-serving declarations have no probative value. Were the rule otherwise, a tort-feasor need only declare his innocence to a number of persons and then call them to testify in his behalf. For obvious reasons litigation involving valuable property rights cannot be resolved on the strength of such testimony.
Appellants contend appellees did not accuse the children of breaking the mantels when the minors visited plaintiffs shortly after their surreptitious visit to the house. This alleged circumstance is alluded to as proof the children did not destroy any mantels at all. Whether plaintiffs accused the children of a particular damage upon the occasion of the visit is immaterial. It was established with reasonable certainty that shortly before these minors entered the house two and one-half mantels remained intact and when they were apprehended these mantels were destroyed. As previously shown, the statement given by the minors acknowledges the destruction of one mantel.
It is settled law that the preponderance of evidence by which a plaintiff is required to prove his case requires only that such proof be to a reasonable certainty. It is not necessary for a litigant to establish his claim to an absolute certainty and beyond all doubt because if proof of such nature were demanded, the negligent or intentionally harmful act could never be proved except by a confession or the testimony of an eye witness. Sollberger v. Walcott, La.App., 101 So.2d 483.
Appellants also contend the award of $3,205 for damage to mantels was excessive. To establish this item, appellees offered the testimony of two experts, namely, Willie A. Francis of Donaldsonville Marble & Granite Co., and Albert DeFrances, a marble and ceramic tile sub-contractor from Baton Rouge. Mr. Francis testified to rebuild the fireplaces in the exact replica and condition of the original would cost approximately $1,500.00 each. This estimate was based on the use of all new marble because, in his opinion, it would be extremely difficult if not impossible to match new marble with the salvaged fragments *765 of the original mantels. According to Mr. Francis, an additional factor contributing to the high estimate was the expense of approximating the carved ornamentation of the original mantels which requires craftsmen possessing highly specialized skill, knowledge and experience. He further explained that his estimate to replace previously damaged fireplaces for the sum of $600.00 each, was predicated upon his rebuilding the mantels in the same general shape and dimensions with no thought of attempting to duplicate the ornately carved originals.
Mr. DeFrances testified the cost of repairing the two downstairs mantels totally destroyed would be $686.30 each while the repair of the upstairs half mantel ravaged would involve an expense of $592.00 for complete restoration. Since defendants are responsible for only half the latter mantel, DeFrances' figures would include only $296.00 for the half mantel or a total of $1,668.60. Mr. DeFrances based his estimates upon the use of marble which appellees salvaged from the broken fireplaces. In this regard he testified that if a polished finish were desired it would be difficult to match the marble, but the marble could be stained to match. He pointed out, however, that stained marble would fade in a few months. He recommended use of a polished finish in which event he was of the opinion any common black marble could be used to match the Italian black and gold and Belgian black marble salvaged from the original mantels.
Appellants argue that plaintiffs are required by law to mitigate the damages and on this basis contend appellees must permit use of the salvaged marble thus reducing the cost of restoring the mantels to the estimates given by Mr. DeFrances. While it is true that the rule of mitigation of damages obtains in this state, it is equally certain said precept is without application to the case at bar.
We are herein concerned with measurement of damages for destruction of property. It is well settled that in such instances the award to which the injured party is entitled is the cost of restoring the property to its former condition. Maryland Casualty Co. v. Rittiner, La.App., 133 So.2d 172. We note that in Lambert v. American Box Co., 144 La. 604, 81 So. 95, 3 A.L.R. 612, the court held that the owner of a gallery destroyed through negligence, was not required to build or accept a veranda constructed of broken material from the old porch but was entitled to an amount sufficient to pay for a portico as good as the one destroyed. The principle therein enunciated is peculiarly applicable to the case at bar considering the historic, architectural and esthetic value of the mantels razed. The party injured by destruction of his property is obliged to minimize the loss but not to the extent of bearing a portion thereof. He is rightfully entitled to full indemnification. Trahan v. Bearb, La.App., 138 So.2d 420. This means he is entitled to restoration of the damaged property to as near its former condition as possible. In the instant case plaintiffs are entitled to the value of mantels substantially as ornate as those destroyed.
Particularly apropos the case at bar is the well recognized rule that where damages cannot be precisely calculated, the courts have much discretion to assess damages consistent with all the attendant facts and circumstances. Simmons v. Zeno, La. App., 168 So.2d 357; East v. Pan American Petroleum Corp., La.App., 168 So.2d 426; Trahan v. Bearb, 138 So.2d 420. Admittedly, in the present matter, the award made by our learned brother below cannot be exactly and accurately calculated, but our own independent consideration of the evidence discloses his award to be reasonable in view of the circumstances existing herein. We unhesitatingly declare we find no abuse of the rather wide discretion vested in him in matters of this character.
*766 Appellants also contend that as to the damages for which the learned trial court awarded the sum of $379.55, the major portion thereof was not wrought by the minors in question and, alternatively, the award of said amount is excessive. The damage in question included broken window panes, floor damage, a hole gouged in the plastered staircase wall, and broken spokes or balusters on the spiral staircase. The mentioned damages were all admitted by the minors in question except that they professed to have kicked out or pulled loose only those balusters already broken or rotten and to have caused further damage only to window panes previously damaged by others. Also included in this latter item of damages were the cost of repairing broken roof tiles and certain shutters, which the minors denied having damaged. Our learned brother below did not itemize said allowance of $379.55 but the formula he employed is readily reconstructed. The evidence discloses damage to the roof attributable to appellants to the extent of $150.00 to $160.00. The trial court apparently awarded the lesser amount. It was further shown the stairway balusters can be replaced at $2.00 each or a total of $12.00. Damage to the stairway wall was shown to be considerably in excess of the amount demanded by plaintiffs consequently the trial court limited appellees to the claimed sum of $15.00. Appellants concede the sum of $15.00 allowed for floor damage is reasonable. It also appears three shutters were damaged to the extent of $55.00 to $60.00 each and other shutters damaged to the extent several slats or louvers needed replacement at a cost of $2.00 apiece. It would appear the trial court awarded $150.00 for these items. Plaintiffs prayed for $37.55 as the replacement value of 29 window panes and while appellants acknowledge the reasonableness of this demand, they nevertheless deny the minors in question caused this particular damage. It is apparent the trial court allowed this amount in damages and we think rightfully so in view of that portion of the hereinbefore quoted statement of Miss Caraway which recites, inter alia, "I think they just about broke every window on the two floors." Appellees have answered the appeal asking for an increase in this latter item. Considering the evidence discloses some of the windows were broken by parties other than those involved herein, we consider the trial court's award in this respect neither excessive nor inadequate and does substantial justice between the litigants at bar.
We come now to the award of $5,000 made Mrs. Hayward for mental anguish over the damage to her property. Defendants concede the law of this state recognizes and permits recovery of damages for mental anguish and humiliation resulting from injury to one's property. See McGee v. Yazoo & M. V. R. Co., 206 La. 121, 19 So.2d 21; Fontenot v. Magnolia Petroleum Co., 227 La. 866, 80 So.2d 845; Belgarde v. City of Natchitoches, La. App., 156 So.2d 132, and cases therein cited.
The record reveals that Mrs. Hayward, an elderly lady, was extremely upset and distraught over the damage wrought upon her property. It further appears she possessed great pride of ownership in Belle Helene because of its beauty, historical significance, architectural value, its worth to the general public having an appreciation of such edifices and, perhaps most important, its prolonged ownership by her family. The physical damage was not entirely irreparable. Despite her mental discomfort resulting from the vandalism in question she was not sufficiently indisposed to require her confinement to bed. It does appear that she was extremely upset for a period of at least two weeks and exhibited distress of a lesser degree for an indeterminate period thereafter. We believe, however, the award of $5,000.00 excessive by the sum of $2,000.00, and accordingly, we will decrease this item to the sum of $3,000.00.
Although appellee William C. Hayward argues his claim for mental pain *767 and anguish should be granted on appeal, no authority has been cited in support of the contention that a person may recover for mental pain and anguish occasioned by injury to property belonging to another. Our own independent research fails to disclose such precedent. Holland v. St. Paul Mercury Insurance Co., La.App., 135 So.2d 145, cited and relied upon by able counsel for appellee is clearly inapplicable to the case at hand. In the cited case it is made clear that damages are recoverable for mental anguish resultant from injury to a third person only in cases wherein there is breach of a primary obligation or duty to the plaintiff. Astute counsel for appellee maintains that having invested some $70,000 of community funds in the restoration project, Mr. Hayward possessed an interest in the property. We do not agree with this conclusion. Investment of community funds in the separate estate of either husband or wife does not give the other party an interest in the separate property. The legal result in such situations is that the spouse whose separate estate is thusly enhanced is liable to the other upon dissolution of the community for one-half the enhanced value of the separate estate occasioned by its improvement with community funds. Williams v. Williams, 215 La. 839, 41 So.2d 736; Abunza v. Olivier, 230 La. 445, 88 So.2d 815; Payton v. Jones, La.App., 38 So.2d 631.
Finally, appellants urge that in the event the claim of appellee William C. Hayward is rejected on appeal, costs should be prorated by the appellate court between said appellee and appellants instead of casting appellants for all costs as did the trial court. Article 1920 LSA-C.C.P. provides assessment of costs is within the discretion of the trial court. In assessing all costs against appellants we find no abuse of the discretion vested in the trial court herein.
Accordingly, the judgment of the trial court is amended in that the award in favor of plaintiff, Helene Reuss Hayward, is reduced from the sum of $8,584.55 to the sum of $6,584.55 and in all other respects affirmed.
Amended and affirmed.