SAMUEL, Judge.
Plaintiff filed this suit to recover $5,943.40 for damages incurred when a quantity of its steel strapping corroded while stored in a public warehouse operated by the defendant. The petition alleges defendant, a paid depositary, negligently stored the steel in an area exposed to the elements, thus causing the corrosion. Plaintiff further pleaded the doctrine of res ipsa loquitur. Defendant answered denying negligence. Essentially its position is that the humid climate in New Orleans caused the rust and there was no negligence or breach of duty on its part as a public warehouseman to which the damage was attributable. After trial judgment was rendered in favor of defendant, dismissing the suit. Plaintiff has appealed.
In July, 1960 plaintiff, a manufacturer of steel strapping used in binding packages and other metal products, began storing material in defendant’s warehouse. It was incumbent upon defendant to inspect the incoming merchandise for possible damage or shortage when shipments of plaintiff’s product first reached its warehouse. If defendant discovered the material was either damaged or short on receipt, it was obligated to report the condition to the common carrier which had transported the goods from plaintiff’s factory to the warehouse. The carrier would then file a report.
Plaintiff stored an average of 300,000 pounds of steel products in defendant’s warehouse from which it delivered merchandise ordered by customers in the New Orleans area. Plaintiff’s sales in the area averaged 150,000 pounds per month. It was also the duty of the warehouse to rotate plaintiff’s stock in filling orders so that the steel stored longest would be shipped out first. As a result most of the steel shipped to this area was in storage on a maximum average of between two and three months before it reached the customer.
The defendant’s warehouse facility is U-shaped. It is composed of two completely enclosed buildings lying parallel to each other. These are connected by a partially enclosed building or dock area that forms the bottom of the “U”. The connecting structure is covered by a pitched roof and has three walls. The fourth side is open. Defendant’s president explained the exposed side of the building was covered by dropping a tarpaulin over the open area when it rained; but he conceded a strong east wind could whip rain under the tarpaulin into the storage area.
After approximately 2l/£ years of satisfactory service, plaintiff began receiving numerous complaints from customers to the effect that the steel strapping delivered was corroded. Several plaintiff officials then visited the warehouse and found a quantity of its steel stored in the three-walled structure. Plaintiff then made these complaints to the defendant: (1) some of the wrappings on rolls of the steel strapping were wet; (2) other wrappings were torn; (3) there were shallow puddles of water on the floor of the partially exposed structure ; and (4) large quantities of plaintiff’s steel was heavily corroded.
Plaintiff’s representative testified its products stored in one of the fully enclosed buildings were not damaged; only the steel stored in the partially exposed area had rusted and when they complained to A. J. Petitfils, Sr., defendant’s president, they were told some of their materials had been moved to the partially open building because there was not enough space in the *274 enclosed structure. Defendant offered no testimony to rebut the fact that the corrosion complained of was limited to plaintiff’s products stored in the three-walled facility.
The litigants’ testimony is in conflict as to the original agreement concerning assignment of storage space. According to plaintiff’s witnesses, defendant’s president promised the steel would be stored in one of the fully enclosed buildings, construction of which was then being completed. Defendant’s witnesses, conversely, assert no such promise was made. According to the defense witnesses, plaintiff’s products had been stored in both the partially exposed area and in the enclosed building for the duration of the agreement. Plaintiff’s representatives, each of whom visited the warehouse four times annually, stated they had never seen their products stored in the exposed dock area until investigating customer complaints in February, 1963 and at that time defendant’s president told them the steel had only been in the three-walled building for some three months. Several weeks after plaintiff registered its complaints, defendant’s president asked them to move their material to another warehouse.
Both litigants concede the following law applies to this case:
“The depositary is bound to use the same diligence in preserving the deposit that he uses in preserving his own property.” LSA-C.C. Art. 2937.
“A warehouseman shall be liable for any loss or injury to the goods caused by his failure to exercise such care in regard to them as a reasonably careful owner of similar goods would exercise, but he shall not be liable, in the absence of an agreement to the contrary, for any loss or injury to the goods which could not have been avoided by the exercise of such care.” LSA-R.S. 54:21.
To determine whether defendant stored the steel as it must be presumed a reasonably careful owner would, we turn to the testimony of plaintiff’s expert and two New Orleans warehousemen called by defendant.
Dr. Robert C. Weaver, the expert referred to, an engineering consultant and professor of chemical engineering at Tulane University, expressed the view that storage of steel strapping in the partially exposed structure would greatly increase the possibility of its rusting.
While the two warehousemen who appeared for defendant said that corrosion of steel is a problem common to warehouse-men in this area because of the humidity, even if stored in a fully enclosed building, both positively stated they would not store steel products in a structure where they would be exposed to the elements through one unenclosed side.
Daniel A. Camp, owner of the Orleans Storage Company, testified his warehouse was fully enclosed by a roof and four walls. In addition he has an unenclosed dock for loading and unloading. We think this excerpt of his testimony on cross examination is significant:
“Q. Do you store any of these metal supplies on that dock area?
“A. Oh no.
“Q. You wouldn’t store them there, would you?
“A. Well, it wouldn’t be protected, see.
“Q. You wouldn’t store any of these metal products in an area where one of the walls would be open and they would be exposed to wind and the rain, would you?
“A. No.”
In our view the conclusion is inescapable that defendant breached the duty imposed on a compensated depositary to preserve plaintiff’s products as would a reasonably careful owner. In reaching this result we are particularly impressed by the testimony of the two warehousemen, both *275 defense witnesses, that they would never store metal products in an area exposed to the elements. This finding obviates the necessity of our discussing the applicability of the doctrine of res.ipsa loquitur. From the record we are satisfied plaintiff established the damage resulted from improper storage. While almost all of the steel strapping stored in defendant’s warehouse was turned over every three months, plaintiff had no complaints from its customers until more than two years after it began using defendant’s facilities. In addition, we are satisfied corrosion to an objectionable extent was found only in that portion of plaintiff’s materials stored in the partially exposed building.
Defendant contends that because some of the products were wrapped on arrival, plaintiff has not established the merchandise was received by them in perfect condition. But it will be recalled that the inspection of plaintiff’s agents in February, 1963 revealed both wet and torn wrappers. Had the merchandise arrived in this condition, obviously it would have been incumbent on defendant to report the damaged condition to the common carrier and there is no evidence that such reports were made. We conclude the corrosion complained of was occasioned by improper storage in a structure open on one side.
While the defendant denies plaintiff’s claim that the latter’s products were to have been stored in the newly constructed and fully enclosed building, defendant offered no evidence to show, nor does it claim, that plaintiff agreed to storage in the comparatively open dock area. Thus it is clear that the defendant’s liability under the law which we have quoted above is in no way lessened by any contractual provision between the litigants. From all of the evidence before us, we also conclude it was incumbent upon the defendant to store the metal products in a completely enclosed structure. Having failed to do so, defendant is liable in damages.
 In assessing damages the general rule is that the injured party is entitled to be compensated for the material lost or the cost of restoring the damaged material to its former condition. Hayward v. Car-raway, La.App., 180 So.2d 758. Because plaintiff’s evidence as to damages is un-controverted it is accepted as true. See Campo v. LaNasa, La.App., 173 So.2d 365. Under these rales plaintiff is entitled to recover these items as damages:
1. Cost of materials used to rewrap damaged steel strapping that was reconditioned in New Orleans. $ 37.77
2. Cost of labor to recondition steel processed in New Orleans. 341.00
3. Production cost of strapping discarded in Chicago after it was determined material could not be reconditioned. 1,565.81
4. Production cost of strapping scrapped in New Orleans which could not be reconditioned. 47.00
5. Freight charges to ship material from New Orleans to East Point, Georgia for reconditioning. 47.80
6. Cost to ship 20,000 lbs. damaged strapping to Illinois factory to determine whether it could be salvaged by reconditioning. 321,20
$2,360.58
*276 In addition, we think plaintiff is entitled to reimbursement for the profits it would have earned on the material that was ultimately scrapped. See Southern Air Transport v. Gulf Airways, 215 La. 366, 40 So.2d 787. The record reflects 50% of the selling price of steel represents profit. Because material processed at a total cost of $1,612.81 was scrapped, we think plaintiff is entitled to judgment in an equal amount representing loss of profit. Accordingly we conclude plaintiff is entitled to damages totalling $3,973.39.
Plaintiff further claims the following should also be assessed as damages, but in our view these are not compensable:
(1) Expenses involved in moving the steel stored in defendant’s warehouse to another warehouse after defendant’s president asked plaintiff to move, including drayage, duplication of handling charges and expenses incurred by plaintiff’s personnel in supervising the move. The record reflects the warehouse was under no obligation to furnish plaintiff storage facilities for any specified length of time. In fact, plaintiff’s agent conceded defendant had the right to require removal of plaintiff’s products at any time. Under the circumstances it would be unreasonable to assess plaintiff’s cost of moving as damages;
(2) The salary and travel expenses from Atlanta to New Orleans for its Southern Regional Manager in connection with the corrosion. The salary claimed is only part of plaintiff’s regular expenses in the total operation of its business. Relative to the travel expenses, the record indicates that plaintiff’s district manager, based in New Orleans, was acquainted with all aspects of the business and could have handled the problems involved;
(3) Reimbursement for freight charges incurred originally to ship the newly manufactured strapping from Illinois to New Orleans. In view of the fact that the bulk of the strapping ultimately was scrapped and we have allowed an award for loss of profits thereon, it would be a duplication to permit additional recovery for freight charges plaintiff incurred in shipping the strapping when it was new.
Finally plaintiff asks for an award of $200-$300 for its expert witness, Dr. Weaver, plus the cost of the photographs introduced in evidence. We think it proper to award plaintiff only the customary expert fee of $100 for Dr. Weaver’s court appearance. Although this expert spent some time at the defendant’s warehouse, in our view his fee for this service is a cost of preparing the case for trial and it is well established that expenses incurred in preparing a lawsuit are not recoverable as damages. See Universal C. I. T. Credit Corp. v. Jones, La.App., 47 So.2d 359. For the same reason the cost of plaintiff’s photographs cannot be assessed as damages.
For the reasons assigned, the judgment appealed from is reversed and it is now ordered, adjudged and decreed that there be judgment in' favor of plaintiff and against the defendant in the sum of $3,973.39 with legal interest from date of judicial demand until paid. It is further ordered, adjudged and decreed that the fee of the expert witness, Dr. Robert C. Weaver, be fixed at the sum of $100 and taxed as costs; all costs in both courts to be paid by the defendant-appellee.
Reversed and rendered.