343 So.2d 367 (1977)
LOUISIANA POWER & LIGHT COMPANY,
v.
Calhoun A. SMITH et al.
No. 7863.
Court of Appeal of Louisiana, Fourth Circuit.
February 15, 1977.
*368 Porteous, Toledano, Hainkel & Johnson, Benjamin C. Toledano, New Orleans, for defendants-appellants.
Monroe & Lemann, W. Malcolm Stevenson, New Orleans, for plaintiff-appellee.
Before SAMUEL, REDMANN and BEER, JJ.
BEER, Judge.
This twelve-year-old case began its long life when Louisiana Power & Light Company (hereafter, "LP&L") sued Calhoun A. Smith and his insurer, State Farm Mutual Automobile Insurance Company for damages incurred on February 28, 1965, when an automobile, owned by Smith and being driven with his permission by his son, collided with a 40-foot wooden utility pole owned by LP&L. The pole was replaced by an LP&L service crew at a cost initially computed by LP&L as follows:

Labor expense $374.46
Trucking expense 47.80
Materials expense 47.50
Overhead 46.98
 _______
 Total $516.74.

At the trial which took place in late 1975, liability was admitted. The computation of recoverable damages was the sole issue at the trial and in this appeal. Defendant seeks, essentially, to limit the damages award to the direct costs of repair, whereas LP&L seeks a more sophisticated method of computation. Trial on the merits resulted in judgment (with written reasons) in favor of LP&L in the amount of $418.02. Defendant has appealed, seeking downward adjustment of the trial court judgment, contending that only the actual direct expenses incurred by LP&L should be awarded. In its answer to defendant's appeal, LP&L claims to be aggrieved by the judgment because the ". . . trial court reduced LP&L's claimed `labor costs' from $360.84 to $284.74." LP&L also seeks an increase in the award for "overhead" from 10% to 13% of the costs of repair.
Obviously, this is a test case with the parties attempting to persuade the court to establish a model method of computing damages when a utility company undertakes its own pole repairs and/or replacement as a result of an automobile collision. Able counsel for both litigants have meticulously and exhaustively discussed each element of damages as it bears upon their respective positions. As persuasive authority, we have been asked to consider various non-Louisiana decisions; however, we first look to our own Louisiana cases:
Southwestern Electric Power Company v. Canal Insurance Company, 121 So.2d 769 (La.App. 2nd Cir., 1960), involved a utility *369 company's claim for damages to their electric light pole. The Second Circuit observed:
"The total expenses incurred by plaintiff were actual, direct out-of-pocket expenses incurred by reason of the tortious act. Plaintiff is, in our opinion, entitled to recover its actual loss in wages and material and is entitled to be restored in the same position it was in prior to the accident. This has been so held by our Supreme Court in Sugar Bros. Co., Ltd. v. City of Monroe, 1931, 173 La. 760, 138 So. 658, and Lambert v. American Box Co., 1919, 144 La. 604, 81 So. 95, 98, 3 A.L.R. 612, . . .."
The court allowed the costs of replacing and setting the new pole, removing the damaged pole, and installing temporary bypass lines.
Some courts in Louisiana have rendered judgments including "overhead" expenses when proven. (See Interurban Transportation Company, Inc. v. F. Strauss & Sons, 196 So. 367 (La.App. 2nd Cir., 1940); Freeport Sulphur Company v. S/S Hermosa, 526 F.2d 300 (5th Cir., 1976).) However, in Illinois Central Railroad Company v. Cullen, 235 So.2d 154 (La.App. 4th Cir., 1970) writs denied 256 La. 789, 239 So.2d 172, we observed that:
"`Overhead' charges . . . without further and sufficient explanation certainly do not appear to be reasonable and ordinary charges and in the absence of such explanations we cannot conclude the same were properly made. The trial court was correct in refusing to render a judgment awarding plaintiff those `overhead' charges."
We are impressed with the discussion in Central Illinois Light Company v. Stenzel, 44 Ill.App.2d 388, 195 N.E.2d 207 (1964), and Ohio Power Company v. Huff, 12 Ohio Misc. 214, 231 N.E.2d 897 (1967). Particularly noteworthy is the following language from the Ohio Power Company case:
"Damages must be proximate and cannot be remote or speculative. There is no logical or legal connection between the breaking of a wooden power pole by the defendant and salaries of clerks in offices, superintendents of construction, distribution superintendents, safety coordinators, general office accounting personnel, supervisors of transmission and distribution, supervisors of labor relations, etc. The salaries of these persons whose salaries are fixed, did not flow from, nor were they affected by the negligence of the defendant. These salaries and expenses would have been paid if the defendant had not broken the pole and damaged the connected facilities. Such operating expenses might be proper in fixing a rate schedule, but we do not feel that they have anything to do with damages to a power pole.
"If we try to compute by a percentage, as claimed by the accountant of the plaintiff, the percentage would be the same if one, fifty, or no poles were destroyed, and would not be affected by the number of items charged to the inventory. Fixed income employees and store expenses are remote matters from the accident which the defendant had.
"This court is in full accord with the statement of Justice Reynolds in his opinion in the Central Illinois Light Company case, hereinabove mentioned, and we quote therefrom:
"`The supervision costs, unless directly connected with the repair of the pole and line, the store expenses, and the general overhead, are such expenses that would have been incurred and paid, without regard to the breaking of the pole. They constitute part of the operating expenses of the plaintiff and this court can see no relation of these costs to the negligence of the defendant. In so holding, this court is cognizant of the complex costs of operation of a business such as that of the plaintiff, but at the same time, this court cannot see any thread of continuity, any relation, whatsoever, between the cost of operation of the plaintiff, and the damages occasioned by the defendant breaking the pole of the plaintiff. We think the rule of damages which requires that the damages must be those that flow *370 as the natural consequence of the negligence of the defendant must not be ignored. In doing so, we are not ignoring the facts of business life, but following the law of damages. To hold otherwise would be to shift some of the costs of operation of the light company from the people who use electricity to those who are guilty of some damage to the property of the company. If this is permitted, it seems logical that any debtor of the light company, upon being sued for the debt, would be liable for overhead, supervision and other items, in addition to the amount of the debt.'
"We further agree with the statement of the law by the court in the New York Electric Company case, [New York State Electric & Gas Corp. v. Fischer, 43 Misc.2d 178, 250 N.Y.S.2d 567], hereinabove mentioned, to the effect that damages to utility property consists of actual cost of expenses together with present day costs of replacing damaged or destroyed equipment, less accrued depreciation.
"The fact that the plaintiff herein is a public utility and subject to the jurisdiction of the Public Utilities Commission of Ohio and the Federal Power Commission should not affect the rule of damages. A tortfeasor should not be penalized because of the public character of the corporation which seeks to recover.
"Accounting procedure cannot change established principles of tort liability. The tortfeasor is liable for the value of the asset at the time of the damage, and any change in this liability resulting from bookkeeping methods is unwarranted.
* * * * * *
"We realize that rate making is not before this court; however, valuation of certain property of the Ohio Power Company, a wooden power pole, is before the court for consideration, and a comparison or examination of value for other purposes may help in shedding some light in the solution of the question herein involved.
"The sections of the Ohio Code which regulate utilities also point up the fact that a public utility is assured of a fair and reasonable rate on its investment through the rates to be charged to its customers, and which said charges cover all expenses by way of wages, salaries, repairs, and upkeep.
"It also protects a utility from any loss by way of depreciation in fixing the valuation of its property and the accompanying rate to be charged. As to depreciation, the argument that an old or used pole is good, and is as valuable as a new pole, so long as it holds up the wires, could well be used for a house, desk, filing cabinet, deep freeze, boat, or any other property; by painting, staining, aluminum siding, and various methods of renewal and preservation, its life might be prolonged indefinitely and it would answer the purpose for which it was originally designed and intended, just the same as a wooden pole treated with chemicals, creosote, etc."
Defendant asserts that a depreciation credit should be allowed. LP&L, on the other hand, claims that their utility poles have no discernible life expectancy beyond a period for accounting purposes and, accordingly, contend that there should be no depreciation credit when a pole is replaced following an accident. LP&L does not internally account for the cost of each pole on an individual basis but rather takes a tax deduction for depreciation based on the entire system of approximately 327,000 poles. While the life of a utility pole may be estimated, it is impossible to determine the actual life of any one pole.
In denying any deduction for depreciation, the trial court relied upon Gulf States Utilities Company v. Guidry, 183 So.2d 122 (La.App. 1st Cir., 1966) and Gulf States Utilities Company v. Faucheaux, 181 So.2d 404 (La.App. 1st Cir., 1965), and, in our view, correctly interpreted the Second Circuit's view expressed in Southwestern Electric Power Company v. Canal Insurance Company, supra, as support for the principle that depreciation should not be taken *371 into account in determining the proper measure of damages under these particular circumstances.
Counsel has stipulated, and the record corroborates, that the actual cost of materials used was $43.98. To this figure, LP&L has added a "8% Stores" charge to cover the expenses of warehousing, including salaries, purchasing, stores accounting, storeroom, freight, physical inventory, and adjustment expenses covering materials that become obsolete. These "expenses" would be incurred even if there was no ascertainable tortfeasor since poles continuously need replacement. These charges are neither closely related to nor directly attributable to defendant's stipulated liability.
The record reflects that an LP&L crew did the necessary repair work from approximately 12:00 a.m. (midnight) to 7:30 a. m.a total of 7½ hours. The record supports a total of 37.5 overtime hours for the crewmen at an average overtime rate of $4.05 per hour. Applying this rate to the 37.5 hours worked (since this was work performed in addition to the regular 8-hour workload for a single day), we find a labor cost for the crewmen of $151.88. The average straight labor rate for the three servicemen who were involved with the repairs is $3.10 per hour and therefore the overtime rate would be $4.65 per hour. Total overtime for the servicemen was 18.5 hours. Therefore, the overtime labor costs chargeable to these individuals amounts to $86.03 (i.e. $4.65 per hour × 18.5 hours). Adding the labor costs for servicemen and crewmen produces a total direct labor cost of $237.91.
The LP&L accounting department had determined the average cost per operating mile of its various vehicles. It has concluded that the company's experience show a current cost of 20¢ per mile for 3/4 and 1 ton trucks 30¢ per mile for trucks 1½ tons and larger. Accepting the actual mileage of the trucks used and applying the rates set forth in the Treasury and Accounting Instructions of LP&L, we find the total cost for the trucks to be $43.80.
Thus, we find that the record supports a recovery for the following actual damages:

 Materials $ 43.98
 Direct Labor 237.91
 Automotive 43.80
 ________
 Total $325.69.

The record further supports a finding that the direct labor costs are not the only labor costs that are attributable to this replacement job.
The record supports a finding that the men who did the work at a direct labor cost of $237.91 also receive fringe benefits which cost LP&L approximately 27.85% of the direct hourly (or monthly) wages yet LP&L's Schedule of Fringe Benefit Costs includes "Premium pay for overtime." Since overtime labor costs have been used as the basis for damages in our computations, we are unwilling to apply the "fringe benefit factor" to the overtime rate, but will apply same to the straight time rate.[1]
An overhead factor is allowable in the ultimate computation but is, by its very nature, necessarily reached on a somewhat arbitrary basis. It is our view that each case must be resolved on its own particular facts. Stated another way, an "overhead factor" can be allowed as a proper item of recovery if, indeed, the district judge has concluded, as a matter of fact, that an overhead factor has been proven. Not every plaintiff in every tort case is able to allege, stand ready to prove, and ultimately prove that there is an overhead factor in the proper computation of the damages that have occurred by reason of a particular tort. In some instances, it is obvious that such a computation would, for all practical purposes, be "deminimis non curat lex." Each plaintiff and his counsel must not only determine whether such an overhead factor *372 is, as a matter of fact, susceptible of proof, but also whether or not it is economically feasible for them to proceed with the order of proof necessary to substantiate this portion of a claim.
If they do, indeed, conclude that such a factor can be proven and is a material item of damages in the particular litigation involved, then they must go forward carrying the burden of this proof in the same manner and with the same dignity as is required for the proof of any other item of damages.
Thereafter, if the district judge before whom the case is being tried concludes that the order of proof with respect to the overhead factor is sufficiently defined and supported by the evidence, then he may, within the broad discretion which he brings to such deliberations, make an appropriate award covering same. We cannot pick and choose some specific percentage as a proper overhead factor. Different circumstances in different settings can, of a certainty, form the basis for vastly different overhead computations and results. It is conceivable that a tortfeasor could be obliged to respond to a judgment that included an overhead factor far greater than 10 to 15 percent and it is, likewise, just as conceivable to conclude that a tortfeasor could not be made to respond to any overhead factor whatsoeverdepending, entirely, on circumstances surrounding the particular order of proof.
To an appreciable extent, the same observations are true with respect to the determination and application of depreciation as an offset.
Certainly, any effort to effect an offset as a method of reducing damages is the burden of the party seeking the offset. Thus, if the record clearly supports a plaintiff's contention that the cost of a new pole (required to be installed because the pole has been destroyed) is a particular amount, then it is the defendant's burden to show that such amount should be reduced by applying some depreciation factor. But, again, only the particular facts of each particular case can set forth a proper basis upon which the trial court may make the ultimate determination of whether or not to allow such depreciation as an offsetting factorand to what extent. If the defendant is able to convince the jury or the trial judge that a depreciation factor is a legitimate deductible in coming to an overall computation of the damages, then it should be allowed. Again, it is conceivable that depreciation could be allowed in very substantial measure in some instances and, likewise, just as conceivable that it could be totally disallowed. In all such instances, the defendant and his counsel must ultimately determine whether or not such depreciation can, in fact, be effectively proven and whether or not the effort to show such depreciation is, in fact, feasible from the standpoint of time, effort, cost of developing the evidence, etc.
What we wish to make clear is that the items of "overhead" and "depreciation" are nothing more and nothing less than elements in the overall order of proof of special damages. They can be proven and disproven, challenged, and supported in the same way as any other item of damages and must, ultimately, pass the same tests applied in proof of damages.
For this court to embark upon the drafting of definitive rules for the finite method of ultimate computation of damages as it has to do with replacement of telephone poles or utility poles would be as futile as to embark upon defining a finite method by which a trial judge or jury should ultimately decide how to fix damages attributable to a broken arm or a ruptured intervertebral disc. The order of such proof is, by its very nature, something that can not be so totally structured as to provide a set mathematical or legalistic formula for its ultimate computation.
In this case, the "overhead factor" which was taken into account in the framing of the judgment is not sufficiently supported by evidence relating it to the matter at issue. In fact, there is really no proof that overhead, as such, is directly related to this particular pole replacement. The only evidence that even concerns itself with this *373 issue is that which shows the method of accounting used by LP&L in figuring overhead. That is not sufficient.
Accordingly, we find that the judgment should be amended as follows:

Labor expense (direct) $ 237.91
Indirect labor expense
(fringe benefits) based
upon the straight time
rate of the crewmen and
servicemen who worked
on the job 39.65[2]
Materials 43.98
Automotive 43.80
 ________
 Total $ 365.34.

As amended, the judgment is affirmed. Each party shall bear its own costs of this appeal.
AMENDED AND AFFIRMED.
NOTES
[1] There is no reason to restrict LP&L's recovery to labor costs based only on the employee's hourly rate of pay if they prove that the overall cost of that labor is, in fact, in excess of that amount. Conversely, a company which provides no provable fringe benefits to its employees may not add such a factor in reaching an ultimate determination of labor costs for a particular job.
[2] LP&L's "fringe benefit factor" of 27.85% includes an overtime factor of 2.05%. Thus, we apply the 25% rounded-off figure (as suggested by LP&L) in making our computation.