REDMANN, Judge.
This appeal by defendant cost-plus contractor and its answer by plaintiff electrical subcontractor question the measure of payment due for wiring a building using wire of lower current-carrying capacity than that specified, in virtually every one of the 200 or so circuits, requiring either replacement of wire (and sometimes of conduit) to raise capacity or else replacement of circuit breaker to make the circuit safe.
Defendant’s principal argument is that this is not a case of substantial performance, in which plaintiff recovers contract price less cost of remedying deviations from the contracted performance. Defendant argues that plaintiff should recover nothing (beyond the progress payments already made) because of lack of proof of quantum of unjust enrichment, if any. Alternatively, defendant argues that it is entitled to deduct from the contract price the full cost of bringing the circuitry up to specified *737 capacities notwithstanding that in half the circuits it did not do so.
Plaintiff’s principal argument is that its written bid did not form the basis for the final contract, which was only for a safe electrical system; the original plans were for a two-story building and they were not revised for the one-story building that was built, and the electrical circuitry had other changes, affecting even the service connections to the public source. Plaintiff contends that it did in all respects supply the safe system bargained for, as well as electrical design services in some instances, and that it should collect the contract price. We disagree, and affirm the trial judge’s conclusion that the contract was embodied in the written bid and acceptance.[1]
*738 We agree with defendant that this is not a case of substantial performance, and therefore plaintiff is not entitled to contract price less cost of curing defects. Yet we agree with the trial judge that, because of the absence of more direct evidence of the value of the installed circuitry and, more important, because the contract price was so remarkably low (about two-thirds of the bid of defendant’s usual electrical subcontractor), contract price less certain adjustments is a fair mechanism for fixing the quantum of unjust enrichment in this case. The reasonable value of plaintiff’s performance^ — -to which alone plaintiff is entitled on the theory that otherwise defendant would be unjustly enriched, La. C.C. 1965 — would necessarily exceed that concededly low contract price less adjustments for defects.
We also agree with defendant that the correct measure of reduction of the price of a defectively performed contract would ordinarily be the cost of curing defects. There can be, however, a serious problem of unjust enrichment when the “defect,” howsoever pervasive, is a noncompliance in a nonessential term and the obligee elects not to cure the defect yet wants credit for the cost of cure. Suppose a painter contracts to paint a house yellow, or with a certain quality paint, but paints it white, or with a different quality: can the owner both (1) elect not to repaint and (2) refuse to pay on the ground that the cost to repaint equals the contract price? Or suppose a builder agrees to build a house with a specified color or quality brick exterior and builds with another brick: could the owner elect to keep the wrong brick and also claim credit for the cost of rebricking? Would such an owner not be taking the benefit of the contractor’s work and material without paying its reasonable value? Is that not unjust enrichment? If we add that the contractor had deliberately used the wrong brick, does that aggravating circumstance change the fundamental unfairness of keeping the substitute work without paying for it? Does that circumstance make the enrichment not unjust?
Our situation is similar to the case last supposed in some respects. The contractor and apparently the owner, working with a cost-plus contract, having concluded that certain circuits were specified at a higher amperage than necessary, have elected to keep the lower-amperage wiring supplied for certain circuits (changing only their circuit-breakers); yet the contractor asks credit for the cost of replacing the wiring. Perhaps it is fairer to say that the contractor asks that the subcontractor be denied recovery because of deliberately using aluminum instead of twice-as-expensive copper in a calculated and substantial breach of contract.
We reply that the choice of remedy was the contractor’s. The contractor might have elected the equivalent of performance of the contract, by replacing all circuitry to upgrade it to specifications and deducting the reasonable cost of replacement from the contract price. But our cost-plus contractor (apparently with the consent of the owner) elected instead to forego performance of the contract by electing to retain many of the circuits the subcontractor supplied that are substantially below contract specifications. The result may well be that the contractor did not owe the contract price because of the subcontractor’s substantial breach; but it does owe the reasonable value of the subcontractor’s retained work because otherwise it (or the owner) would be unjustly enriched. It is just that an owner should have, and pay only once for, work that he has contracted for, and thus he does not pay for both the original misperformed work and the redoing of it. It is thus just that the loss of the misperformed work fall on the misperformer. But it is not just, if an owner elects to keep the misperformed work, that he should not pay at all, not for the misperformed (but accepted) work and *739 not for redoing it (because he does not have it redone). It is not just that the misper-former be charged with the loss of the misperformed work when there is no loss. The same considerations exist as to the 94 circuits plaintiff agreed to wire with copper wire but deliberately wired instead with copper-clad aluminum. We therefore conclude that defendant contractor (who is being paid cost-plus by the owner, who in turn receives the benefit of plaintiff’s work) must pay the reasonable value of plaintiff’s retained work, and is not entitled to credit for the cost of redoing work that was not and is not to be redone.
The evidence in the record is not wholly satisfactory for a determination of the reasonable value of the retained work. One who contracted for a copper 20-ampere circuit but receives an aluminum 15-ampere circuit is not enriched by the contract price less the difference in cost of the wire. That measure would give the bad performer a great percentage profit than the good performer. The contract price includes an element for overhead and profit usually based on a percentage of total cost of labor and material; thus, for example, 20% for overhead and profit would add $200 to a price based on $1,000 cost of copper wire, but only $100 to the $500 cost of the much cheaper aluminum wire. If the bad performer retained the $200, he would make 40% on the $500 instead of the 20% bargained for. Thus the subcontractor is not only not entitled to the price of copper, but also not entitled to overhead and profit percentages applied to the price of copper.
In our case we conclude that, because the original contract price here was already as low as one could hope to find, the elimination of the extra cost of copper or other wire specified but not provided (including extra overhead and profit) brings the price down to a price that any reasonable party would pay for the lower-capacity, aluminum-wired circuits. Even that price might be questionable if it includes profit to the subcontractor on the copper-clad substituted for the specified copper in an attempted fraud, and profit on the labor used to install the deliberately substituted wire. However, the basis for denying all profit in such a case is the ancient maxim that no one should profit by his own wrongdoing and, because of the circumstance that we oblige plaintiff to pay for the necessary new circu-itbreakers in all of the circuits that were to be copper, plaintiff loses far more than any profit he might otherwise have made on the substituted aluminum and its labor. Accordingly plaintiff has no profit in those circuits.
We sympathize with defendant’s objection to paying any profit whatsoever to a subcontractor who deliberately and deceitfully breaches a contract while making it appear that he has performed. (There was testimony by a former employee of plaintiff that he was instructed to burn the cartons marked “copper-clad” so that defendant’s supervisor would not see them; even more telling is that plaintiff consistently billed defendant for copper but used copper-clad aluminum on extra work on the job.) As we have just noted, however, there remains no profit on the circuits that were to be copper. (There was no similar bad faith by plaintiff in the other circuits; it used the wrong gauge wire by misreading plans.)
We conclude that, from the evidence available, the fairest approximation of the value of plaintiff’s performance is the remarkably low contract price reduced by (1) all costs of upgrading to specifications those circuits that were upgraded; (2) all costs of making safe those circuits that were not upgraded to specifications; and (3) differences in cost between wire and conduit specified and that supplied, together with estimated overhead and profit on those differences.
Defendant argues that, as a general contractor, it should also recover 20% overhead and profit on all costs of curing defects. For example, in item 2 the subcontractor charged $1,051.50 for material, $651.45 for labor, $275.44 for overhead and $197.83 for profit, for a total of $2,176.22, upon which defendant seeks to charge an additional 20% or $435.24 “overhead and profit” for itself.
*740 Defendant is entitled to employ a subcontractor to cure the defects; it is not obliged to employ electricians or to buy materials itself. But when the subcontractor adds charges for overhead and profit to the cost of material and labor, that constitutes the total cost of curing the defects and defendant is not entitled to any more. See Louisiana Power & L. Co. v. Smith, La.App. 4 Cir. 1977, 343 So.2d 367, for discussion of the general problem of overhead as an element of damages.
We discuss the individual circuit problems in cost to cure or other adjustment in an appendix.
Plaintiff finally argues that the judgment errs in awarding interest from judgment rather than from judicial demand. The basic rule is that interest is due from the time the principal payment is due, C.C. 1938; Paul M. Davison Petr. Prod. v. L. T. Brown Contr., La. 1978, 364 So.2d 583. However, Succession of Butler, La. 1974, 294 So.2d 512, holds that the quasi-contrae-tual payment due to avoid unjust enrichment is not due, within C.C. 1938, until judgment.
The judgment on the main demand is amended by increasing its principal by $2,891.04 to $10,847.98 and it is otherwise affirmed. Costs of this appeal are to be divided equally.
APPENDIX
1.Main panel to kitchen panel plans required, in aluminum equivalent, No. 2/0 THW and plaintiff used #1, at a cost differential of $41.50. Defendant replaced this circuit using a subcontractor whose labor cost was $289 and who charged 15% overhead on labor and material plus 10% profit on labor, material and overhead, or a total of 26.5% for overhead and profit. This circuit presents a special problem, however, in that defendant decided to replace not with 2/0 but 4/0 aluminum. While defendant’s exhibit and the trial court’s judgment properly deducted only the excess cost of 2/0 aluminum, the judgment by oversight deducted the entire amount of the subcontractor’s overhead and profit, including part based on the more expensive 4/0 wire. Defendant’s exhibit shows the cost of 4/0 was $347.08 and that of 2/0 was $112.04, or an excess cost of $235.04 of which 26.5% is $62.29. We therefore increase the judgment by that amount.
We are aware that, because the plans were wrong, defendant would have had the cost of labor to replace the wire with 4/0 aluminum even if plaintiff had installed 2/0 aluminum as the plans required. It is in this instance (and another) that we deem it decisive that plaintiff did not perform as it promised: had it done so and defendant still had to expend labor to rewire for higher capacity, plaintiff would be entitled to its pay, notwithstanding that the defendant kept no benefit from that performance. But, since plaintiff did not perform as promised, and defendant kept no benefit from the substandard performance, plaintiff is not entitled to any pay for its labor.
2. In room air conditioner circuits, because over 20 amperes, aluminum could be substituted. But plaintiff used the same gauge and, moreover, used a conduit too small to accept the larger gauge aluminum required to give the capacity. Defendant had therefore to replace with copper. The cost of doing so was less than replacing both wire and conduit and it was properly deducted.
3. Similarly other air units Nos. 2 and 4 required rewiring at a cost of $82.48 which was correctly deducted. By oversight the judgment also deducted $16.50 contractor’s profit which is not recoverable and we therefore further increase the judgment by that amount.
4. As in item 1, defendant’s rewiring to the KP panel raised capacity beyond design, but plaintiff is nevertheless not entitled to its labor cost (or overhead and profit) for installing wire not of any value to defendant and not capable of carrying the originally specified current. By error, however, the judgment charged overhead and profit on all material, which included doubled-capacity wire and circuit breakers. Defendant’s exhibit shows the cost of the correct *741 wire would have been $99.09 ($50.59 plus $48.50) while the cost of the doubled-capacity wire plus circuit breakers was $1,536.09, or an extra $1,437 on which plaintiff should not pay overhead and profit of $380.81, by which amount we accordingly increase the judgment. (We note also the problem that charging plaintiff 100% of labor costs ignores that some labor went to changing the two three-pole circuit breakers. However, we view that as probably a minimal part of labor costs; see item 9, in which 102 smaller, mostly single-pole breakers were changed for less than $284 of labor. Furthermore, we place the burden of proof of the value of its services on plaintiff although the paucity of evidence obliges us to work backwards from the contract price. We therefore disregard this problem.)
5. As in item 3, we eliminate contractor’s profit and overhead of $3.32 on replacing a ballast.
6. Cost of replacing undersized conduit with that specified by plans is chargeable to the subcontractor.
7. We agree that the contractor did not prove entitlement to deduct an estimate of the value of the subcontractor’s warranty on fixtures.
8. Completion of contract as to hanging 27 light fixtures is deductible; the contractor had the right to refuse to allow plaintiff to complete because of plaintiff’s breach.
9. This item includes the 94 20-ampere room circuits on which copper was promised but copper-clad aluminum was deliberately supplied. On learning that 15 amperes would suffice for these circuits’ needs, defendant (and, presumably, the owner for whom defendant acted as a cost-plus contractor) elected, as the “easiest and least costly” remedy, to replace the circuit breakers with lower-capacity ones. The trial judge charged plaintiff with the $1,013.25 differential between copper and copper-clad wire (but not overhead and profit on that differential), plus the $1,028.88 cost of installing the necessary 102 small circuit breakers. We further disallow overhead and profit on the $1,013.25 differential, estimated at 20% or $202.65. (Plaintiff worked for 15% or less on extras; the substitute subcontractor’s charges were 26.5%. We elect a middle course of 20%.)
10.Sub-feeders from main to subpanels employed 4/0 THW aluminum which should have been the heavier gauge 300 MCM, and also used two- instead of two-and-a-half-inch conduit. However, because defendant elected not to change these sub-feeders, the judgment awarded only the difference in material cost. We hold that the subcontractor cannot be paid for overhead and profit on a material cost he did not expend and we therefore further deduct our estimate of 20% on that account. We note, however, that defendant’s calculation of the price difference is erroneous because it prices 4/0 at $131 (apparently from a price estimate of a few months earlier) and 300 MCM at $610 with a difference of $479 per 1000 feet. The price list in evidence prices them at $383.61 and $610.25, with a difference of $226.64. The correct difference is that between the two prices at the same time. Thus defendant overstated the price difference by $252.36 per 1000. Total footage is 2,145 and the total overstatement of price difference is $541.31, by which we increase plaintiff’s judgment. Similarly, the list that prices 750 MCM at $1,286, as does defendant, prices 500 MCM at $878 for a difference of $408 while defendant priced it at $370 for a difference of $916, making defendant’s figure an overstatement by $508. Only 92 feet are affected, making the overstatement $46.74, by which we increase the judgment. On the other hand defendant understates conduit price differentials (except as to 23 feet of three-inch whose cost may be wrong but whose replacement cost is unclear). Defendant credits two-inch conduit at $137.45 and would charge for 2.5-inch at $196 per hundred feet, while the price list shows $120.20 and $196, indicating an understatement of price difference of $17.26 for a total understatement of $123.41 on 715 feet of conduit, by which amount we reduce the judgment. We would thus preliminarily reduce the judgment’s deduction on this item by $464.64, from $1,609.78 to $1,Í45.14. Then, *742 denying plaintiff our estimate of overhead and profit of 20% on this $1,145.14 of materials supposed to have been but not supplied, we increase that deduction by $229.03 to $1,374.17, for a net increase to the overall judgment of $235.61.
11. The automatic transfer switch was offered for a price of $1,500 by plaintiff’s proposal. Irrespective of what plaintiff paid for the switch, plaintiff is entitled to the contract price.
12. These matters were treated as defense to claims for extras.
13. The lighting fixture “allowance” of $4,500 was underexpended by the $391.50 allowed. Although plaintiff’s attempt to charge 16 or 20% over cost in two instances is insupportable, defendant’s argument that it should recover overhead and profit on this $391.50 is also mistaken. Had defendant elected higher-priced fixtures it would not have paid overhead and profit on the excess over $4,500. The bargain was that plaintiff would install the fixtures (for part of the base price), and that defendant would pay for the fixtures themselves, although an “allowance” of $4,500 was stated, not included in the base price. Plaintiff owed nothing but the installing. To the extent it breached its obligation to install it is being charged with the $157.65 cost of the installation by another in item 8.
14. 15 and 16. The missing nurse call cords and sterilizer wiring and the broken fixture glass were properly charged to plaintiff.
17. Defendant’s charge of $20 hourly for its employee’s time in inspection of electrical work and overseeing correction — like its already-rejected charge for overhead and profit on the cost-to-cure is not recoverable under Louisiana Power & L. Co. v. Smith, supra. If the contractor had caused the subcontractor to replace the wire, the contractor could not (in the absence of some contractual agreement) charge the subcontractor for “supervision” of the corrective work. Perhaps the defective work would not have occurred had the contractor properly supervised the original subcontractor, and it could be argued that the contractor has properly supervised only once, for which it has been paid by the owner. But perhaps the most fundamental reason is that the contractor’s charge for overhead and profit pays for the supervision it gives to a job, including supervision of any necessary correction of defective work; the subcontractor does not pay the contractor to supervise, but owes only performance of. the work as contracted, and if a first subcontractor’s work is defective then he may owe the price of a second subcontractor’s redoing the work but he does not owe supervision for the second subcontractor. Thus we must increase plaintiff’s award by the $2,601.50 the trial judge allowed.
Extras are, by now, largely undisputed. We do, however, add, to the deduction of $1,587.23 for charging for copper while using aluminum (and other overcharges for material), the 13% tax and profit that plaintiff charged on material, or $206.34.
The total changes are thus $62.29 + 16.50 + 380.81 + 3.32 + 235.61 + 2,601.50, a total of $3,300.03 in plaintiff’s favor, and $202.65 + $206.34 in defendant’s favor, for a net increase in the judgment of $2,891.04.

. Not all pre-contract negotiations are detailed, but plaintiff submitted an offer in the form of a “proposal” to furnish labor, tools and material for the electrical installation for the nursing home “as shown on [Plans] Sheets 13, 14, 15 and 16,” with certain alternates at fixed prices to be added to the base bid (such as the automatic transfer switch in dispute) and “allowances [e. g., for lighting fixtures] which are not [sic] included.” The proposal stipulated “copper wiring on all 20 Amp. Circuits. Larger feeders are aluminum.”
The proposal stipulated it might be withdrawn if not accepted within ten days. Plaintiff argues that, with skyrocketing prices for copper wires, it could not hold to that bid using copper. However, when over two months later defendant in writing “awarded the contract” to plaintiff at the price plaintiff bid but stipulated that T.V. antenna outlets be added, plaintiff did not reject the acceptance of its proposal either as untimely, see C.C. 1801-1802, or as not “in all things conformable to the offer”, C.C. 1805. To the contrary, plaintiff, accepted defendant’s written modification (“a new offer”, C.C. 1806) by beginning to perform, without any written indication that plaintiff, too, desired to modify its original offer by eliminating copper wire in 20-ampere circuits. Despite plaintiffs officer’s testimony that defendant verbally agreed to “copper-clad” aluminum wire (aluminum wire with a coating of copper) in place of copper, we conclude that the trial judge was correct in determining that the contract between the parties is specified by plaintiffs proposal, modified by defendant’s “award” into a counteroffer by defendant which was accepted by plaintiff.
Some unclarity exists in the contract and has had to be resolved by parol.
First, the sheets of the plans to which alone plaintiffs proposal referred (without referring also to the separate document “Specifications”) do not in words describe either copper or aluminum wire, although the Specifications expressly require all copper. Nevertheless plaintiffs argument that the plans’ requirements were met by supplying aluminum of the gauge specified is unacceptable. In most instances the plans’ statement of an amperage capacity of circuit-breakers indicates that the wires of the stated gauge must be copper because that gauge aluminum cannot carry that amperage safely. There is also expert testimony that, in the absence of an indication by the plans one understands that copper is the standard material or that, at least, one must refer to the Specifications. Furthermore, plaintiffs proposal stipulated that copper was to be used in 20-ampere circuits, impliedly recognizing that the twice-as-expensive copper was the standard material, although the proposal further declared “Large feeders are aluminum.” We conclude that the plans themselves call for copper in all cases, although plaintiffs agreement was to substitute aluminum in some cases.
The second unclarity arises from “Large feeders are aluminum.” To what extent was aluminum substitution agreed upon? Although “large feeders” may be understood by some to comprise only the wires from the public supply lines to the user’s main panel, defendant’s officer’s testimony is that, at a pre-contract discussion of the correctness of plaintiffs markedly low bid, “we agreed on aluminum sub-feeders.” We further conclude, in view of plaintiffs low bid and its specification of copper only for 20-ampere circuits, that the parties’ contract was for aluminum in branch circuits above 20 amperes.
The third unclarity is that “feeders are aluminum” could provide aluminum equivalent to the plans’ copper wire in size (with lesser amperage capacity than copper) or in amperage capacity (with a larger size than copper). Because the purpose of electric wires is to carry current, an otherwise unspecified proposal to substitute aluminum for copper must be understood to substitute aluminum of equivalent current-carrying capacity. The testimony of several experts was that one substitutes aluminum larger than the size specified for copper, in order to obtain equivalent current capacity. There was thus sufficient evidence to support the trial judge’s conclusion, implicit in his treatment of individual circuits, that the pure or copper-clad aluminum wire should have been larger than the size specified for copper.
Plaintiff supplied aluminum wire (pure or copper-clad), the same size (except for the main feeders) as specified for copper, throughout the entire job. (The aluminum main feeders’ capacity far exceeded the specified copper’s.) Thus plaintiff breached the contract not only by installing copper-clad aluminum in 20-ampere circuits, for which he had promised copper, but also by installing lower-capacity wiring virtually throughout.
*738 The trial judge correctly disregarded plaintiffs officer’s unsupported theory that copper-clad aluminum has significantly greater current capacity than pure aluminum because of “skin effect,” even, plaintiff says, at the low frequency of 60-cycle alternating current. The only superiority of copper-clad over pure aluminum established in this record is in electrical connections; its surface avoids the conductivity problems pure aluminum’s oxidation causes.