**HOUSTON OIL & MINERALS CORP., Plaintiff-Appellee Cross-Appellee and Cross-Appellant,**

v.

**AMERICAN INTERNATIONAL TOOL COMPANY, Defendant-Appellee Third Party Plaintiff Cross-Appellant and Cross-Appellee,**

**GIBRALTER INSURANCE COMPANY, Defendant-Appellant,**

v.

**AMF TUBOSCOPE, INC., Defendant-Appellant Cross-Appellee,**

**PINE TOP INSURANCE COMPANY, Defendant-Appellant,**

v.

**ARMCO, INC., Defendant,**

**Marine Drilling Company, Third Party Defendant-Appellee.**

No. 86–4360.

United States Court of Appeals, Fifth Circuit.

Sept. 24, 1987.

John A. Jeansonne, Lafayette, La., for AMF.

John Nickerson Chappuis, Lafayette, La., for American Intern. Tool, et al.

Susan Severance, Nicholas J. Gachassin, Jr., Lafayette, La., for Houston Oil & Marine Drilling.

Before REAVLEY, POLITZ, and HIGGINBOTHAM, Circuit Judges.

POLITZ, Circuit Judge:

American International Tool Company (AITCO), the owner-lessor of a "mud saver sub," a solid steel pipe-like device used in oil well drilling operations, and AMF Tuboscope, Inc., a codefendant who inspected the sub prior to its use, appeal a judgment after a bench trial awarding damages to Houston Oil & Minerals Corporation, owner of a mineral lease. We modify the judgment and, as modified, affirm.

### Background

Houston Oil, co-owner and operator of an oil, gas, and mineral lease, acting through its parent corporation, Tenneco, Inc., arranged for Marine Drilling Company, a drilling contractor, to drill a well on its lease. The Houston Oil lease is located offshore Louisiana in Vermillion Block 75. The well was drilled from Marine Drilling's jackup drilling vessel, the J. Storm IX.

The mud saver sub is a tubular, solid-steel tool, approximately three feet in length, used as a connector between the kelly, the portion of pipe that goes through the rotary table, and the drill stem. The device has dual functions: to prevent the waste of the drilling mud in the kelly when the drill pipe is "broken off" (unscrewed) during entry into or withdrawal from the hole, and to bear the brunt of the forces and stresses involved in breaking and "making up" the drill stem during the addition or removal of joints of pipe.

The sub has a box end which connects to the kelly and a pin end which joins to the drill pipe. The center of the housing is bored to receive an internal spring valve. The entire circumference of the center of the sub is machined to create a recessed area approximately six inches in length and one-eighth inch deep. A rubber protector is affixed in this area to serve as a bumper or guard when the sub strikes the casing through which the drill pipe passes. Stresses concentrate at the recess and are relieved by smooth curves called fillets. The dynamics are such that curved fillets attract far less stress than those cut at 90 degrees. The sub in the case before us had

two fillet radii, one near the box end and one near the pin end.

Oil Tool Machine fabricated the sub and sold it to AITCO, who fitted the internal valve. AITCO employed AMF Tuboscope, an inspection company, to perform a "full-length dry powder magnetic particle inspection" on the subject sub and several other new subs. The purpose of the test was to detect any cracks or scoring in the metal. The magnetic particle test is performed by applying a magnetic field to the metal surface to be tested, dusting the surface with fine metal filings and then blowing the fine powder off. Any powder remaining signals a crack or scoring in the metal surface.

There was conflicting evidence whether the AMF inspector found a machining notch. The sub was repaired twice. After a leak was noted, the box end was refaced by OTM. During the second inspection, which extended only to the box and pin end connections, galling of the box end was noted and that end was re-machined. The sub was then again rented to Houston Oil.

On January 4, 1982, Marine Drilling was reaming the hole, that is to say, the hole was being cleaned and smoothed. The sub broke in two. The break occurred at the fillet radius on the box end. At that time the bottom of the hole was at 14,649 feet. The drill string was extended to a point where the drill bit was approximately 375 feet from the bottom of the hole. When the sub broke the drill stem fell down the hole.

"Fishing" operations were partially successful. The nearest part of the drilling stem, including the bottom part of the sub, was removed by use of an "overshot." Ultimately, the well had to be "side-tracked" and redrilled. Twenty-two days of drilling time were lost.

Houston Oil sued, *inter alia*, AITCO, OTM, and AMF Tuboscope, urging theories of negligence and products liability. Applying Louisiana law, made applicable by the Outer Continental Shelf Lands Act (Lands Act), 43 U.S.C. §§ 1331–1356, the trial court cast all three defendants in judgment for the damages occasioned by the failure of the mud saver sub. This appeal followed.

## Analysis

A. *Choice of law: does maritime law control?*

■ The parties and the trial court uncritically accepted the application of the Lands Act, which calls into play "as the law of the United States," the law of the state adjacent to the offshore site, in this instance Louisiana. We conclude likewise, but deem this important issue worthy of discussion.

Since Judge Wisdom's definitive opinion for this court in *Offshore Co. v. Robison*, 266 F.2d 769 (5th Cir.1959), we have held consistently that the general maritime law remedies for a vessel's unseaworthiness, the protections of maintenance and cure, and the statutory rights provided by the Jones Act, 46 U.S.C. § 688, extend to certain oil field employees working on special-purpose watercraft in the exploration for oil and gas lying beneath navigable waters. Our cases applying the Jones Act and general maritime law to accidents aboard submersible, semi-submersible, jackup, and other movable rigs located in inland shallows, on the outer continental shelf, or the high seas, are legion. *See, e.g., Vickers v. Chiles Drilling Co.*, 822 F.2d 535 (5th Cir. 1987) (Jones Act and maritime law applied on jackup rig); *Rogers v. Eagle Offshore Drilling Services, Inc.*, 764 F.2d 300 (5th Cir.1985) (seaman on inland drilling barge denied recovery, applying Jones Act and general maritime law); *Domangue v. Penrod Drilling Co.*, 748 F.2d 999 (5th Cir. 1984) (Jones Act and general maritime law applied to accident aboard drilling barge); *Wallace v. Oceaneering Int'l.*, 727 F.2d 427 (5th Cir.1984) (accident aboard semisubmersible rig bolted to Gulf floor); *Lambert v. Diamond M Drilling Co.*, 683 F.2d 935 (5th Cir.1982) (semisubmersible rig); *Spinks v. Chevron Oil Co.*, 507 F.2d 216 (5th Cir.1975) (maintenance and cure issue on jackup rig); *Case v. D.J. McDuffie, Inc.*, 502 F.2d 969 (5th Cir.1974) (drill barge unseaworthiness); *Dugas v. Pelican Const. Co.*, 481 F.2d 773 (5th Cir.1973) (unseaworthiness of inland submersible drilling

barge); *Thibodeaux v. Rowan Drilling Co.,* 429 F.2d 573 (5th Cir.1970) (unseaworthiness of submersible rig afloat in Gulf of Mexico). *See also, D.J. McDuffie, Inc. v. Old Reliable Fire Ins. Co.,* 608 F.2d 145 (5th Cir.1979) (maritime law applied to property damage claim for capsize of submersible drilling barge). We take as a given that in this circuit, at least in the area of personal injury, admiralty jurisdiction and the applicability of maritime law to these *Robison*-defined special-purpose watercraft is unassailably established.

In the case at bar we are constrained to apply non-maritime principles as a consequence of our holding in *Sohyde Drilling & Marine Co. v. Coastal Gas Prod. Co.,* 644 F.2d 1132 (5th Cir.1981). In *Sohyde,* we held that a property-damage claim caused by a well blowout was not governed by maritime law. The blowout occurred during workover operations from a submersible drilling barge resting on the bottom of an inland Louisiana waterway. Analyzing the issue under the two-pronged test of *Executive Jet Aviation, Inc. v. Cleveland,* 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972),[1] as refined in the tetrad analysis suggested in *Kelly v. Smith,* 485 F.2d 520 (5th Cir.1973),[2] we concluded that the case lacked maritime flavor and would be governed by Louisiana law, 644 F.2d at 1136–37:

> There seems little doubt that if the present action were one for personal injuries under the Jones Act or maritime law sustained by one having the status of a *Robison* seaman that the drilling barge, even in its submerged position, would be considered a "vessel" for purposes of the Act. *See, Offshore Co. v.*

*Robison,* 266 F.2d 769, 779, 1959 A.M.C. 2049 (5th Cir.1959); *Producers Drilling Company v. Gray,* 361 F.2d 432, 434 (5th Cir.1966). However, we are not convinced that the term "vessel" for Jones Act purposes, which is subject to liberal construction consistent with the purposes of the Act, is necessarily a vessel for other purposes as well.... Although the Sohyde 28 may have had some maritime character at the time of the well blowout—in the sense that it floated in and presumably would float out—it clearly was not substantial.

\* \* \* \* \* \*

... The record is littered with references to blowout preventers (consisting of pipe rams, blind rams and hydrils), tubing, drilling mud, and the like. None of these instrumentalities have a peculiarly salty flavor.

Likewise, the panel concluded that the alleged causes of the Sohyde accident—failures to operate the rig and properly use and maintain its equipment—"could just as easily have occurred on land." *Id.* In sum, the damages aboard the submerged barge in *Sohyde* were deemed "indistinguishable from those arising from land-based well blowouts." *Id.* at 1138.

*Sohyde's* analysis and holding draws some support, albeit attenuated, from the recent Supreme Court decision in *Herb's Welding v. Gray,* 470 U.S. 414, 105 S.Ct. 1421, 84 L.Ed.2d 406 (1985), which held, in reversing a panel of this court, that work aboard an offshore drilling platform is not inherently maritime employment under the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901–950.[3] Not-

1. *Executive Jet* added to the traditional navigable water locality test a requirement "that the wrong bear a significant relationship to traditional maritime activity." 409 U.S. at 268, 93 S.Ct. at 504, 34 L.Ed.2d at 467.

2. The *Kelly* court stated:

> From the facts and analysis of *Executive Jet* and *Peytavin* [*v. Government Employees Ins. Co.,* 453 F.2d 1121 (5th Cir.1972)] we can discern factors to be considered in [determining whether admiralty jurisdiction exists]: the functions and roles of the parties; the types of vehicles and instrumentalities involved; the causation and the type of the injury; and

> traditional concepts of the role of admiralty law.
> 485 F.2d at 525.

3. Although the analysis of maritime employment under the LHWCA, like the *Executive Jet* test for admiralty jurisdiction, involves an analysis of the location where an injury occurs ("situs") and the relationship the injury has to maritime activity ("status"), the analyses are not necessarily the same. Nonetheless, the Supreme Court's ruling under the LHWCA in *Herb's Welding* gives some signal of the Court's concept of maritime activity for admiralty purposes. Since *Herb's Welding* involved a personal injury, it may be seen to undermine a tradi-

withstanding such support, we foresee a potential for confusion with our maritime personal injury holdings which eventually may occasion an en banc revisiting of the *Sohyde* rationale.

On a practical level, *Sohyde* requires the application of potentially inconsistent rules of law to different claims arising from a single incident. For example, in the likely scenario [4] of a blowout on a movable rig in inland waters causing both personal injury and property damage, maritime law would apply to the latter while state law would govern the former. Juries, already called upon to sort out differences between unseaworthiness, maritime products liability, maintenance and cure, Jones Act negligence and ordinary negligence—as well as the relative fault of the parties—would draw the added task of sorting out property damage claims under subtly or openly dissimilar state law rubrics. This invites the spectre of unwanted confusion with a potential for unjust results and a loss of the uniformity admiralty law seeks to provide.

The continued vitality of *Sohyde's* restrictive rule is perhaps prejudiced by the decision in *Foremost Insurance Co. v. Richardson,* 457 U.S. 668, 102 S.Ct. 2654, 73 L.Ed.2d 300 (1982). In *Foremost,* two pleasure craft collided on the Amite River, a navigable waterway in Louisiana. The district court concluded that because neither boat was engaged in commerce the collision did not bear a sufficient relationship to maritime activity to support admiralty jurisdiction. A panel of this court reversed, noting that to rule otherwise "would be injecting an uncertainty that would plague litigants and the courts." 641 F.2d 314, 316 (1981).

The Supreme Court granted certiorari and affirmed, noting "the *potential* impact on maritime commerce when two vessels collide on navigable waters, and the uncertainty and confusion that would necessarily accompany a jurisdictional tort tied to the commercial use of a given boat...." 457 U.S. at 677, 102 S.Ct. at 2659, 73 L.Ed.2d at 307–08 (emphasis added). We are inclined to believe that these same interests would support admiralty jurisdiction in cases of property damage aboard movable drilling rigs, since a damaged rig may as easily obstruct a navigable waterway.[5] As *Foremost Insurance* illustrates, actual disruption of commerce need not occur to support jurisdiction. The court should look to the general character of the tort, its actual or *potential* impact on maritime commerce or navigation, and the desirability of the application of uniform law. In the case at bar, as in *Foremost Insurance,* although there was no actual disturbance of interstate commerce, the potential for it existed. There is also the strong pull of the common thread in all admiralty jurisdiction cases— uniformity and simplicity in governing rules.

---

tional rule of the scope of admiralty jurisdiction in offshore oilfield cases involving personal injuries. At least two current members of the Supreme Court have indicated a desire to address the proper scope of the Jones Act. *See International Oilfield Divers, Inc. v. Pickle,* — U.S. ——, 107 S.Ct. 939, 93 L.Ed.2d 989 (1987) (White, J., joined by the Chief Justice, dissenting from denial of certiorari).

**4.** For example, see our recent decision in *In re Incident Aboard D/B Ocean King on 8/30/80,* 813 F.2d 679 (5th Cir.1987). In this factually complex case neither jurisdiction nor choice of law was made an issue or discussed.

**5.** Moreover, this potential disruption arises out of an activity directly related to maritime commerce, differentiating this case from *Executive Jet.* In *Foremost* the Court recognized that the plane crash in *Executive Jet* had the potential to disrupt maritime navigation. *Foremost,* 457 U.S. 668, 675 n. 5, 102 S.Ct. 2654, 2658 n. 5. But this potential disruption did not support admiralty jurisdiction because the underlying activity—aviation—was entirely non-maritime. By contrast, the underlying activity in *Foremost* —pleasure boating—was related to maritime activity because pleasure boaters regularly share navigable waters with commercial vessels. The resulting need for uniform navigational rules, according to the Court, established a substantial relationship between pleasure boating and traditional maritime activity.

The operation of movable drilling rigs on navigable waters implicates an identical relationship. Like pleasure boats, movable rigs regularly share the water with commercial vessels, even when stationary. Since this interaction necessitates uniform rules, the potential disruption in maritime commerce caused by a damaged oil rig is related to maritime activity in a way which aviation is not.

■ For today, however, *Sohyde* impels our resolution. Maritime law is not to be applied. Accordingly, since this accident occurred on the outer continental shelf, and there is no conflict with federal laws or regulations, the law of the adjacent state, Louisiana, becomes surrogate federal law, to be used in resolving this dispute. The decision by the district court to apply the same was correct.

## B. *Liability*

The district court gave Houston Oil a judgment *in solido* against AITCO, OTM, and AMF Tuboscope. AITCO was held liable under Louisiana's strict products liability principles. OTM and AMF Tuboscope were found negligent. Defendants contend that the trial judge erred in his findings of fact and must be reversed. The district court's findings are protected by Fed.R.Civ.P. 52(a), and may be reversed only if found to be clearly erroneous, that is, if we are of the "definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746, 766 (1948).

■ Where there are two or more permissible views of the record evidence, an appellate court may not reverse the trial court's selection. *Anderson v. Bessemer City*, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). That is the scenario before us today. All parties agree that the sub broke as a result of metal fatigue. Houston Oil blamed the failure on improper machining of the sub. A Houston Oil expert examined the pieces of the sub and concluded that the fillet radius had not been properly machined because of a notch near the box end. As explained by that expert, such a notch focused increased stress on the area and caused a crack and, ultimately, failure. A second expert agreed with this conclusion.

Defendants offered testimony of experts who said they found no evidence of a defect and expressed the opinion that the sub's failure was caused by misuse. The trial judge weighed this and other evidence, obviously making credibility assessments, and made factual findings in support of the opinions expressed by the Houston Oil wit-

nesses. We are not prepared to say that any factual finding on liability is clearly erroneous. Those findings stand.

■ Based on the court's findings of fact, its conclusions on liability are correct. AITCO's liability was premised on Louisiana products liability law which prescribes that

[i]n order to recover from a manufacturer, the plaintiff must prove that the harm resulted from the condition of the product, that the condition made the product unreasonably dangerous to normal use, and that the condition existed at the time the product left the manufacturer's control. The plaintiff need not prove negligence by the maker in its manufacture or processing, since the manufacturer may be liable even though it exercised all possible care in the preparation and sale of its product.

\* \* \* \* \* \*

A product is unreasonably dangerous in construction or composition if at the time it leaves the control of its manufacturer it contains an unintended abnormality or condition which makes the product more dangerous than it was designed to be.

*Halphen v. Johns-Manville Sales Corp.*, 484 So.2d 110, 113, 114 (La.1986). The trial court found that the sub contained an unintended abnormality, the notch in the fillet radius, which constituted a defect under Louisiana law. We agree.

■ OTM was found negligent for the manner in which it machined the sub from standard steel stock. There is no error in the suggestion that a reasonably prudent, careful machine shop would have machined a smooth fillet radius, free of any notch or scoring.

■ Finally, the trial court concluded that AMF Tuboscope was negligent in its inspection of the device by "passing the tool for use." The evidence was in conflict but the court credited that which reflected that the inspector was aware of a machining groove but noted no defect in his report. The applicable legal standard is not disputed. Under *Williams v. Louisiana*

*Machinery Co., Inc.,* 387 So.2d 8 (La.App. 1980), "[a]ll persons or entities holding themselves out as possessing certain skills or capabilities owe a duty to whomever procures their services to perform the task in a non-negligent, prudent and skillful manner." The trial court concluded that AMF Tuboscope failed to perform professionally in accordance with its obligation. We perceive no error in that conclusion.

### C. *Indemnity*

■ AITCO, liable as a consequence of the strict products liability principle, maintains that it should be indemnified by OTM and AMF Tuboscope who were negligent in machining and inspecting the sub, respectively. We are so persuaded. As the Louisiana Supreme Court recently observed in *Dusenberry v. McMoRan Exploration Co.,* 458 So.2d 102, 105 (La.1984),

> [w]hen liability *to the injured party* [here, Houston Oil] is imposed on one party on the basis of strict liability only and on a second party on the basis of negligence or actual fault, the strict liability defendant may recover full indemnity by incidental demand against the party actually at fault.

Louisiana's highest court qualified this broad rule in a footnote, reasoning that

> [i]ndemnity is only available when ... the strict liability defendant is liable to the injured party on the basis of responsibility, imposed without proof of negligence, for an unreasonably dangerous condition which the negligent defendant actually treated and which the strict liability defendant neither concurrently caused *nor had an opportunity to actually discover and remedy.*

*Id.,* n. 3 (emphasis added). AITCO falls within the protected parameters of this rule, provided it had no opportunity to actually discover and remedy the defect. Prior to leasing the sub to Houston Oil, AITCO sought to determine if it contained any defects. AMF Tuboscope, an expert, was hired for that very purpose. The report given to AITCO gave no indication of any defect. Rather, AITCO received a green light to lease the tool. AITCO acted responsibly and it is entitled to indemnification from the negligent parties.

### D. *Damages*

■ The parties contest certain items of damage; defendants would prefer to pay less, Houston Oil would prefer to receive more. Damages involve factual determinations which we review under the clearly erroneous standard. *Belton v. Fibreboard Corp.,* 724 F.2d 500 (5th Cir.1984). We find qualifying error as to three items of damages.

■ The district court refused to award damages for Schlumberger logging units ($7,109.00), drilling control monitors ($4,165.00), and communications charges ($1,838.00) incurred during the 22 extra drilling days. The court found that these were fixed costs which would have been incurred regardless of the accident. That finding is clearly erroneous. Houston Oil is entitled to recover the costs actually incurred during the additional days of work on the rig. Those costs include the costs of the logging units and monitors. Defendants' accountant conceded the propriety of these costs if proven. They were adequately proven and should be allowed. We find no error in denial of the communications charges. The record reflects that these charges were primarily, if not totally, for relay equipment and services aboard a different rig. The record is not adequate to support a finding that these charges were for the exclusive use of the J. Storm IX, or that they resulted from the 22 additional days of drilling needed to bring the subject well to completion.

A more difficult damages issue relates to the propriety of overhead expenses. Houston Oil challenges the trial court's refusal to award damages for certain salaries and shoreside support facilities relevant to its Vermillion Block 75 operation.

■ Under Louisiana law, overhead expenses, including salaries, directly incurred as a result of a tort, are recoverable items of damages. *Louisiana Power & Light Co. v. Smith,* 343 So.2d 367 (La.App.1977); *Magnolia Constr. Co., Inc. v. Causey,* 421 So.2d 990 (La.App.1982). In this case, $11,304 claimed in engineering salaries were proved to be directly related to the 22 additional days and should have been awarded.

The engineers billed their time to the projects to which they were assigned. The hours billed to the J. Storm IX during the extra drilling days are as much a direct, real, and compensable loss as the other expenses incurred as a consequence of the fishing and redrilling operation. The court erred in denying this item of recovery.

 We do not reach that conclusion, however, about the costs of the dock and helipad facilities Tenneco maintains at Intracoastal City, Louisiana for support of its offshore operations. Under Tenneco's internal operating procedures, each rig served by the facilities was charged a pro rata portion of their total cost. The sum of $159,091 was charged to the J. Storm IX during the 22 additional drilling days. Houston Oil maintains that it should recover that cost.

Our resolution of this issue is guided by the detailed discussion of damages in *Louisiana Power & Light Co. v. Smith,* a case involving a broken power pole in which the court quotes at length from *Ohio Power Co. v. Huff,* 12 Ohio Misc. 214, 231 N.E.2d 897 (1967):

Damages must be proximate and cannot be remote or speculative. There is no logical or legal connection between the breaking of a wooden power pole by the defendant and salaries of clerks in offices, superintendents of construction, distribution superintendents, safety coordinators, general office accounting personnel, supervisors of transmission and distribution, supervisors of labor relations, etc. The salaries of these persons whose salaries are fixed, did not flow from, nor were they affected by the negligence of the defendant. These salaries and expenses would have been paid if the defendant had not broken the pole and damaged the connected facilities. Such operating expenses might be proper in fixing a rate schedule, but we do not feel that they have anything to do with damages to a power pole.

If we try to compute by a percentage, as claimed by the accountant of the plaintiff, the percentage would be the same if one, fifty, or no poles were destroyed, and would not be affected by the number of items charged to the inventory. Fixed income employees and store expenses are remote matters from the accident which the defendant had.

The *Huff* court in turn *quoted* the Illinois Supreme Court's decision in *Central Illinois Light Co. v. Stenzel,* 44 Ill.App.2d 388, 195 N.E.2d 207 (1964):

In so holding, this court is cognizant of the complex costs of operation of a business such as that of the plaintiff, but at the same time, this court cannot see any thread of continuity, any relation, whatsoever, between the cost of operation of the plaintiff, and the damages occasioned by the defendant breaking the pole of the plaintiff. We think the rule of damages which requires that the damages must be those that flow as the natural consequence of the negligence of the defendant must not be ignored. In doing so, we are not ignoring the facts of business life, but following the law of damages.

Although we sit as a Lands Act court and not an *Erie* court, and as such are not irrevocably bound to follow an intermediate state appellate court decision, we are convinced of the soundness of the *Smith* court's analysis and opt to follow it. In the case at bar, the failure of the sub did not cause the costs of the dock facilities and helipad to be incurred. Those expenses existed independent of the J. Storm IX. That is in contrast to the expenses for the engineers whose work was specifically for that rig during the extra drilling days. But for the accident, the work of the engineers would not have been necessary. Likewise the drilling control monitors and logging units would not have been used for additional days had the accident not necessitated extra drilling. The same cannot be said as respects the dock and helipad facilities.

Finally, defendants object to an award of $115,722 for mud and chemicals supplied by N.L. Bairod during the 22 days. We find ample record support for that award.

### E. *Interest*

 The judgment as modified by the district court allowed prejudgment interest at 12% per annum, as required by Louisi-

ana law, La.R.S. 13:4203 and Civil Code art. 2924, and postjudgment interest as prescribed by federal law. Houston Oil contends that it is entitled to the higher Louisiana rate both prejudgment and postjudgment. We do not agree.

Although earlier writings involving interest in Lands Act cases, *Musial v. A & A Boats, Inc.,* 696 F.2d 1149 (5th Cir.1983); *Aymond v. Texaco, Inc.,* 554 F.2d 206 (5th Cir.1977); *Berry v. Sladco, Inc.,* 495 F.2d 523 (5th Cir.1974), seemed to preclude prejudgment interest, more recent decisions have permitted such. In *Olsen v. Shell Oil Co.,* 708 F.2d 976, 984 (5th Cir.1983), we held that "where ... a district court awards prejudgment interest to a prevailing [Lands Act] plaintiff whose remedy is based on surrogate state law, the award should not be disturbed on appeal if supported by that state law." More recently we have required such an award and have remanded for modification of judgment to award prejudgment interest. *Haas v. Atlantic Richfield,* 799 F.2d 1011 (5th Cir. 1986); *see also Smith v. Shell Oil Co.,* 746 F.2d 1087 (5th Cir.1984). Whereas the right to prejudgment interest under state law has evolved, the *Berry-Aymond-Musial* line of cases requires that postjudgment interest be at the federal rate. The district court did not err in its assessment of interest.

### *Conclusion*

The judgment of the district court is MODIFIED, as discussed herein, and, as modified, the judgment is AFFIRMED. The matter is returned to the district court for entry of a judgment consistent herewith.

MODIFIED and AFFIRMED.